## HARMAN v. HARMAN (two cases).[1]

### (Circuit Court of Appeals, Seventh Circuit. November 6, 1895.)

### Nos. 39 and 55.

1. PAROL EVIDENCE—CONTEMPORANEOUS WRITING.
   Where parties make an agreement partly in writing and partly by parol, and do not profess to reduce the entire contract to writing, but only a certain part thereof, it is competent to show by parol evidence the entire contract; but—per Jenkins, Circuit Judge, dissenting—the oral agreement must be consistent with and must not contradict the stipulations of the written contract.

2. SAME—WITNESSES—COMPETENCY AND CREDIBILITY.
   Where nephews who had taken possession of their uncle's lands under a written lease from him, and had made extensive improvements at their own expense, claimed, after his death, that the lease was only a part of the contract, and that there was a further parol agreement that upon his death they were to have the lands as their own, *held*, that while, under the statute of the United States, their own testimony was admissible as against devisees of their uncle, yet the court would be unwilling to decree in their favor upon their testimony alone, but would do so where their evidence was sufficiently corroborated.

3. DEEDS—DELIVERY TO EXECUTOR.
   A delivery of deeds, pursuant to an oral contract under which the grantees were to have the lands after the grantor's death, to one of the grantees, as the executor of the grantor, to be opened after his death, is not a delivery such as will immediately pass the title; and, if the deeds are afterwards recalled, the transaction is a nullity.

4. PAROL EVIDENCE—ADMISSIBILITY—CONTRADICTION OF WRITING—ADDITIONAL AGREEMENT.
   Certain nephews went into possession of lands belonging to their uncle, executing a written lease thereof. They also received of him some $15,000, for which they gave their notes, with interest at 10 per cent. They spent the money mainly in making improvements, and after his death claimed that there was an oral agreement, in addition to the lease, that upon his death the land was to be theirs absolutely, and that their notes for the borrowed money were also to be void. The lease was renewed from time to time during the uncle's life, and rent and interest were regularly paid. The lease contained some expressions apparently inconsistent with the alleged oral agreement; and in the last extension a condition was added that "the party of the second part will quit and give up possession of said premises at the expiration of any one year in case the party of the first part shall sell or convey all or any part of said lands, or in the event that either party should die or become dissatisfied," or upon failure to pay rent or interest. The nephews testified that they signed the extension containing this condition because their uncle insisted upon it, assuring them that it would make no difference, and they should have the lands just the same, and because he was aged, infirm, fretful, and with evidences of insanity, which made them afraid to oppose him. Their testimony was strongly corroborated, both as to this point and as to the existence of the oral agreement. This extension was executed some months before the expiration of the then existing term, and never went into operation, because of the uncle's death before that time. *Held* that, assuming the nephews had a valuable equity in the land, there was no consideration for this release of their rights, except as the seal to the agreement imported a consideration; that in a suit by the nephews against persons to whom the uncle had devised the lands the lease did not operate as an estoppel by deed, because it came in question only in a collateral way; that it did not operate as an estoppel in pais, because no person was induced by it to change his condition to his prejudice; that its highest effect was as an admission by the nephews under

---

[1] Rehearing denied January 30, 1896.

seal that their relation to their uncle was only that of landlord and tenant; that the court could consider the evidence showing the existence of the parol agreement; that it was competent for the court upon a proper and reasonable basis to reconcile the inconsistencies between the leases and the parol evidence; and that, upon the whole evidence, the parol agreement was sufficiently established to enable the court to award a specific performance thereof in respect to the conveyance of the lands. Jenkins, Circuit Judge, dissenting, on the ground that the alleged parol agreement was not made out by clear and satisfactory evidence, was in direct contradiction of the written documents signed and sealed by the parties, and was, therefore, inadmissible to control the meaning thereof; and that on the whole case there was no such equity in favor of the complainants as would justify the court in excepting the case from the rule forbidding the contradiction of written contracts by parol evidence. 51 Fed. 113, reversed.

5. SAME.

Held, further, that as the notes for the borrowed money were given upon a full consideration, and were valid obligations at law, they stood upon different ground, and, although there was evidence that the uncle intended to give the nephews the principal at his death, there was no such equity in favor of complainants as would warrant the court in enjoining the enforcement of judgments at law obtained upon the notes by the uncle's executors.

6. SAME—COMPETENCY OF WITNESSES—DEATH OF PARTY TO CONTRACT.

Where it is sought to claim real estate, after the death of the owner, under an alleged parol contract, in addition to a contract in writing, that the parties making the claim were to have the land upon the owner's death, the parol contract may be supported by the testimony of the claimants as against devisees of the owner, as the statutes of the United States only exclude the testimony of surviving parties as against the executors or administrators of the deceased; but such evidence should not stand upon equal ground with the testimony of a party who can be confronted with the one whose declarations are in question, and a court of equity should not only apply the general rule that the evidence of the undertaking should be clear and satisfactory, but should also insist that such evidence should in all essential particulars stand uncontradicted, and be fully corroborated. Per Jenkins, Circuit Judge, dissenting.

7. ATTORNEY AND CLIENT—PRIVILEGED COMMUNICATIONS—DEATH OF CLIENT.

The lips of an attorney are forever closed as to statements made to him by a client, unless opened by the client, and this does not cease by the sundering of the relation, nor upon the death of the client. The inhibition of the law is enduring, prohibiting at any time and under all circumstances the disclosure of the confidential communications of the client. Per Jenkins, Circuit Judge, dissenting.

Appeals from the Circuit Courts of the United States for the Northern and Southern Divisions of the Northern District of Illinois.

J. N. Jewett, E. A. Otis, and Horace S. Oakley, for appellant.

John Lewis, Jesse A. Baldwin, James S. Norton, and A. D. Thomas, for appellees.

Before HARLAN, Circuit Justice, JENKINS, Circuit Judge, and BUNN, District Judge.

BUNN, District Judge. These causes are bills in chancery to enjoin the collection of certain judgments at law recovered by the executors of Jacob Harman, deceased, against the complainants, and to enforce specific performance of a contract for the conveyance of certain lands situate in Iroquois county, Ill. The two cases stand substantially, though not wholly, upon the same equities, and by con-

sent were heard together; the evidence in each of the cases, so far as applicable, to be considered as offered in the other.

It is alleged by the complainants that they each entered into possession of the land severally described in the bills of complaint under an agreement with Jacob Harman, resting partly in parol and partly in writing, by which they were respectively to take possession of the land in question, which was for the most part unimproved, cultivate and improve the same, and pay an annual rent, to be agreed upon from time to time, to Jacob Harman, during the continuance of his natural life, and also to pay interest upon certain sums of money advanced to them by said Jacob Harman; and that upon his death they were to have as their own the land, as well as the money so advanced; that they entered into possession under such agreement, occupying the land for a series of years, numbering from 10 to 15 years, and until the death of Jacob Harman, on February 23, 1885, cultivating the land so occupied, and making large and valuable permanent improvements thereon, and paying the stipulated rent to Jacob Harman, and in all respects fulfilling their agreement with him, insomuch that the same had at the time of his death become, as far as the complainants were concerned, a fully-executed agreement entitling them to a specific performance of the contract.

A large amount of testimony was taken, mainly of a parol character, tending to support the allegations of the bill. But among the other testimony is a lease in writing of the lands made by Jacob Harman to the complainants, respectively, and which was extended from time to time by the parties. There is no intimation in the lease that there was any other contract existing between the parties, and the court below dismissed the bills, not because the alleged contract was not made and fully executed by the complainants, but because no parol evidence could be received to show that any other relation existed between the parties than that of landlord and tenant as evidenced by the written lease. And, if the case comes fairly within the strict rule of law applied by the court, excluding all evidence of parol testimony showing a fully-executed parol agreement for the conveyance of the land, then the decrees must be affirmed. On the other hand, if it be allowable for this court to consider all the evidence in the case, written and unwritten, in order to determine what the full contract really was under which complainants held, a different result may undoubtedly be reached, and a larger and better equity meted to the parties.

It is nowhere questioned by the court below that a contract, such as is claimed by the complainants, existed in parol, and that it had been fully executed by the complainants through all the years during which they were in possession of the lands, paying the stipulated rent, and making permanent and valuable improvements, partly from money which they made on the lands and partly from money which they borrowed from Jacob Harman for that purpose. But the complainants' bills were dismissed on the ground that the evidence of such agreement and the full execution thereof cannot be considered by the court, because it conflicts with and seeks to change

the effect of the written lease. Upon very full and careful consideration of the case this court is of opinion that, instead of the case coming within the rule invoked by the court below, it comes fairly within one of the acknowledged exceptions to that rule, which is that, where the parties make an agreement, partly in writing and partly by parol, and do not profess to reduce the entire contract to writing, but only a certain part thereof, it is competent to show the entire agreement. We think the case comes rather within the rule laid down by Greenleaf, and supported by the adjudged cases, as an exception to the rule followed by the court below, as follows: "Nor does the rule apply in cases where the original contract was verbal and entire, and a part only of it was reduced to writing." See Greenl. Ev. § 284a; 2 Tayl. Ev. §§ 1135–1147; Mann v. Smyser, 76 Ill. 365; Ludeke v. Sutherland, 87 Ill. 481; Bross v. Railroad Co., 9 Ill. App. 363; Ballston, etc., Bank v. Marine Bank, 16 Wis. 125. If this may be done in this case,—that is, the entire contract be shown,—as we believe it may, without violence to established rules of law, the court will be in a position to do full justice to the parties according to the real understanding. Indeed, it would rather imply a serious defect and limitation of the inherent powers of a court of chancery if, in the circumstances of this case, as disclosed by the evidence, the court were precluded by a rule of evidence from preventing fraud and doing full justice to the parties according to the facts. As remarked by the court below in its opinion, there is little conflict in the testimony, which goes to show that such an agreement existed as is claimed by the complainants, that it was acted upon and understood all through the deal between the parties, and fully lived up to and executed by the complainants. Jacob Harman was an old man, was never married, and had no children. He was willing, and even eager, to enter into close family relations with the complainants, who were his nephews. He showed a strong desire and will to adopt them as his heirs, and to stand in the relation to them of loco parentis. He was always a thrifty man of property. He was a man of strong will, and with all his desire to benefit his nephews he was very tenacious of doing it in his own peculiar way, and without any particular regard to their wishes. When the relation was entered into, and the boys went on to improve the lands, he insisted upon the contract, so far as it secured any benefit to him, being put into writing, securing the payment of a stipulated rent; while that portion which inured to the benefit of the nephews, and was, indeed, the principal inducement on their part to entering into the arrangement, he was willing should rest in parol, requiring them to take his word, oft repeated, for its performance, which they were willing to do. Sometimes he would intend to carry out his part of the contract by making provisions in his various wills for giving them the lands upon his death. At other times, and on three distinct occasions, he made similar provisions by deeds, which were executed by him, but not to be delivered until his death; thus keeping the reins always in his own hands, and under his own control. His will was always law to the complainants, and he was always tenacious in hav-

v.70f.no.10—57

ing them accede in all points to his wishes. But there is no evidence that at any time during his life he ever indicated any other intention than that of giving his nephews the land, until just previous to his death, when he sent to Jacob M. Harman, to have him bring him the envelope containing the deeds of the land, in order to make correction of a mistake; whereupon they were delivered up into his hands, which is the last trace that is had of their existence. The evidence shows that the complainants had implicit confidence in their uncle, and were always ready to bend their wishes to his. They were content that the main contract by which they were to have the land upon his death should rest in parol, not doubting, but fully trusting, their uncle that he would do according to their mutual understanding and agreement, which is proven by so many corroborating proofs as to leave no reasonable doubt of its existence, and the certainty of its terms. The court, in such a case, would not be willing to rest a decree in complainants' favor upon their testimony alone, though competent to be given under the laws of congress, as the claim for specific performance of the contract for the sale of the land is not against the executors, but against the legatees and beneficiaries under the will. But the complainants' testimony is corroborated by a large number of other witnesses, who were the neighbors and friends of both parties, who are wholly disinterested, and who give their testimony in such a way as to leave no reasonable doubt of its truth.

The history of the case is substantially this: Jacob Harman was the brother of Anthony Harman, and for many years resided in Warren county, Ind. His brother Anthony, who is the father of the complainants, and also Oscar P. Harman, Waldo L. Harman, John J. Harman, Mrs. Lee, and Mrs. Hamilton, resided in the early 60's in Randolph county, Mo. In 1852, and again in 1860, Jacob Harman visited his brother Anthony, who was then living upon his own farm in Missouri with his boys; among others, the complainants. Having no children, Jacob Harman proposed to take back to Indiana his oldest nephew, Jacob M. Harman, promising to make him his principal heir if he would go home with him to Indiana, and live with him as his son. Jacob M. Harman still being under age, his father declined to let him go until arriving at his majority. Accordingly, Jacob M. continued to reside with his father until he became 21 years of age in 1862, when he went to live with his uncle in Indiana, and where he worked for him without compensation, while the little money he had brought from Missouri was placed in his uncle's hands, and was paid out to him in small sums, as the nephew requested. Anthony Harman, during the war, had become security for a slaveholder, who lost his slaves, and by that means Anthony lost a good part of his property in making good the debt. Being embarrassed, he conveyed his farm in Missouri to his brother Jacob for $1,500, which he received in cash, and thereupon removed to Warren county, Ind., and lived with Jacob upon the farm of the latter, working the farm on shares. This was in the fall of 1864. Just prior to this event, Jacob Harman sent the nephew Jacob M. Harman to Missouri, to take charge of the farm Anthony had conveyed to Jacob,

and there remained until 1870, when the Missouri farm was exchanged for lands in Indiana, and Jacob M. returned to live with his uncle Jacob in Indiana. Previously, however, to this,—in 1867, —the uncle and nephew had met at Danville, Ill., whither cattle had been shipped from the Missouri farm. At this meeting the relations which afterwards continued so long between Jacob Harman and this nephew began; that is to say, that relationship had its inception at this meeting. It was agreed that Jacob, the uncle, should build a house upon his unimproved land in Iroquois county, Ill., and that the next year Jacob M. should return from Missouri, and take the Iroquois county farm, which comprised several thousand acres, and is mainly the land in controversy in these suits. The agreement was that Jacob Harman should receive rent for the farm during his life, and that upon his death the land should belong to the nephew. Afterwards Jacob Harman wrote the nephew to remain upon his farm in Missouri until he could sell it. The exchange of the Missouri farm for lands in Indiana was brought about in 1870, and it was not until the spring of 1871 that Jacob M. went into possession of the Illinois farm under the aforesaid agreement. Meantime, in 1868, Jacob Harman had sent another nephew, Oscar P. Harman, a brother of Jacob M., to settle upon the Iroquois county lands. He settled upon a portion of the lands, and began to improve them. In the spring of 1871, Jacob Harman sent Jacob M. to settle upon and assist in the improvement of the lands. During the first five years— 1870, 1871, 1872, 1873, and 1874—the rent was settled by dividing the produce raised upon the land. The money to stock the place was furnished by the uncle, the work done by the nephews, who paid one-fourth of the net proceeds of the land to the uncle. At the close of these years a new arrangement was made. A change was made in the quantity of land to be held by each nephew, and also in the manner of paying the rent. At this time all of the uncle's lands in Iroquois county were held by these two nephews, except a small quantity leased to one Gallup, who paid no rent. This lease was bought up, and another nephew, Jeremiah Robert Harman, one of these complainants, was let in to share the land with the other two. At this time the land was apportioned among the three nephews according to the wish of the uncle, and the division thus made continued until the death of Jacob Harman in 1885, except that Jacob M. Harman relinquished one 80-acre tract, and a tract known in the litigation as the "Sumner Tract" of 460 acres was acquired by Jeremiah R. Harman in 1880. Jeremiah R. Harman desired more land. Sumner owned 460 acres adjoining that allotted to him by the uncle. Jacob Harman owned about the same amount of land in Benton county, Ind. An exchange of these lands was effected by Jeremiah R. Harman and one Fowler, the son-in-law of Sumner; Jeremiah R. Harman paying $250 towards the difference in the value. This Sumner tract was added to the land held by Jeremiah R. Harman, and on the same terms as the other,—that he should pay rent during the life of Jacob Harman, and then the lands should be his. Up to this time no memorandum of the agreement to give the land to the

nephews had been put into writing except that Jacob Harman, by his wills, had devised the lands to them, with a remainder over to their children, respectively. In March, 1880, immediately after the Sumner trade was effected, deeds were prepared and executed by Jacob Harman conveying all the lands in Iroquois county to the three nephews. The person who prepared these deeds does not remember the descriptions nor amount of land granted to each, and the deeds were never delivered, but they were absolute conveyances, purporting to give title in fee to the nephews respectively, and his wills also made during the period direct that packages of deeds found among his papers at his death should be given by his executors to the persons to whom they were respectively addressed. In 1881 the uncle again executed deeds of the land in Iroquois county to his nephews Jacob M. and Jeremiah R. Harman, but again the scrivener cannot remember the land conveyed in each, but remembers that the deeds called for a considerable quantity of land. In 1882 he executed a third set of deeds which the scrivener, T. M. Davis, with the aid of the original memorandum and plat furnished him by Jacob Harman, and apparently in his handwriting, is able to describe accurately, and which are the same lands claimed in this suit. These deeds were placed by Davis in an envelope at Jacob Harman's request, and were afterwards sealed up with some other papers by the uncle, and handed to Jacob M. Harman, as one of the executors of his will, to be opened upon his death. This plat and memorandum from which these deeds were drawn, and the testimony of the witness in regard to the transaction, are so important that we subjoin copies of the plat and memorandum with a portion of Mr. Davis' testimony, as follows:

### Memorandum.

Indorsed on back of paper is the following:

"Jacob M. Harman, of Ill., son of Anthony Harman.
320 W. ½ Sec. 18, Town 25, North Range 10, West.
80 N. ½ N. W. ¼ Sec. 19, Town 25, North Range 10, West.
640 Section 13, entire        "     "     "     "   11,   "
320 E. ½ Sec. 14, Town 25, North           "   11,   "
80 N. ½ N. E. ½ Sec. 23,      "     "     "   11,   "
160 N. ½ N. ½   "   24,     .    "     "     "   11,   "
40 S. E. ¼ N. E. ¼ Sec. 16,    "     "     "   12,   "

1640

O. P. Harman.
320 W. ½ Sec. 14, Town 25, North Range 11, West.
320 E. ½ Sec. 15,   "     "     "     "   11,   "
160 E. ½ W. ½ Sec. 15, Town 25, North Range 11, West.
40 N. E. ¼ N. W. ¼ Sec. 23, Town 25, North Range 11, West.

840

As settled.
J. R. Harman.
80 N. ½ N. E. ¼ Sec. 19, Town 25, Range 10, West.
John H. True, a minor, in Frederick Co., Va.
40 S. E. ¼ N. W. ¼ Sec. 24, Town 25, North Range 11, West.
40 N. E. ¼ S. W. ¼ Sec. 24, Town 25, North Range 11, West.

80"

G. Fetherlin.

PLAT.

Range 11

Range 10.

22

23

15

14

Oscar P. Harman

840    Acres

Jacob M. Harman

of Illinois    13

Son of Anthony Harman

1600 Acres

J. H. True

24

18

19

Range
Line

J. R. H.

N
W——E
S

Signed T. M. Davis.

Thomas M. Davis testified, among other things, as follows:

"He said he wanted to make deeds for those Illinois lands for the boys out there. That he before thought of leaving them by will, but said he had made up his mind now to leave them by deed. That he would like to have me prepare deeds. That the next time I came over I could bring them out for him, and have his acknowledgment. At that time we made a plat of the lands, and fixed out the description of the lands,—divided them as he wanted it amongst the boys, Matt, Oscar, and Bob. I have that plat now. [Witness here produces plat referred to.] He also wanted a deed made for eighty acres to one of the True heirs. Jacob Harman was present when I prepared that plat. He saw that plat after I had prepared it, and looked over it, and said that it was as he wanted the deeds made. The written description on the side of the paper I call the plat was put there at the time the plat was made. It is in my handwriting. I got this description from Mr. Harman after we made the plat. He showed me what he wanted Jacob M. and Oscar P. to have, and then we took from the sections there the right descriptions. The words 'as settled' on this paper I suppose are in Mr. Harman's handwriting. But I don't know. I didn't see him write it. They were on the paper when I put these descriptions on. Who wrote them I cannot tell. They have nothing to do with this paper. Jacob Harman furnished this piece of paper upon which this plat was made. The word 'Featherland' was written across the edge of the paper at that time. That has nothing to do with the paper that I know of. Mr. Harman, at the time of making these deeds, said these boys in Illinois went there to farm these lands and to improve them; and then at his death they were to have them. Any way it was to be divided in the manner in which the deeds were made. He said they were paying him so much money every year, but I don't recollect his stating how much they paid every year. There was nothing said about their paying interest. At the same time I prepared a deed for eighty acres of land for this True boy. He said he wanted that eighty-acre tract to be deeded to the True boy. He was an heir in Virginia. The first time he spoke about it he said he would have to see the Illinois boys, and get them to release that, and then he wanted to deed that to him. And then he went on, and told how he wanted to make the deed, and all the circumstances. The piece on the plat marked with the letters 'J. R. H.,' the north ½ of the northeast ¼ of 19, was a piece of land over on the state line that he wanted to deed to Jeremiah R. Harman. He said he would see Matt, and get him to release that and this are one both. He wanted the eighty over next the state line to be deeded to Jeremiah R. Harman, and I prepared the deeds that deeded that to Jeremiah. I made a deed for Jeremiah R. Harman's land, and one to Matt, and one to Oscar. The True deed was not made just at that time. It was made some time after that, because there was another matter that he wanted to try to fix up about the True land. He said he would not make that for a while. Two weeks may have elapsed between the time I made that plat and went home and prepared the deeds and took them back to him. It may have been as much as a month. Mr. Harman acknowledged the deeds that I had made, and I took the acknowledgment. I don't know whether Matt Harman had come from Illinois to Warren county between the time of my making the plat and coming back with the deeds. After having taken this acknowledgment I put the deeds in a white envelope, and laid them on the table. He said: 'Do not seal the envelope. I have some other papers that I want put in with the deeds;' and then he said, 'When Matt comes down, I will turn them all over to him.' And he said, 'When I put in those papers I will seal it, and mark on the back of it "To be opened at my death" '; and he said: 'When Matt comes down, I will deliver them to him, and let him keep them, and at my death he can open them, and there will be the deeds. He can give the deeds to the boys, and there will be his deed for his land.' I never saw the white envelope afterwards. I do not know anything about it. I did not see him write anything on it. He talked frequently about the lands in Illinois when I was there. He told me about the agreement with the boys in regard to the lands, more than once. I do not recollect that he ever told me what they were to pay per year for the use of the land. If he did I have forgotten it."

It is insisted by complainants' counsel that the making and delivery of these deeds was a conveyance of the land. But the difficulty with this view is that the deeds were not delivered to take

effect at that time, but were delivered to the nephew Jacob M. Harman, as one of the executors of Jacob Harman's will, to be opened and finally delivered to the proper parties after his death; and were afterwards recalled by him, so that no delivery of the deeds to pass immediate title was ever effected. It is further insisted that if the deeds did not serve to pass the title they constituted a memorandum in writing to take the case out of the statute of frauds. But the difficulty with this view is that the deeds are not produced, and so the existence of the memorandum in writing is depending wholly upon oral testimony, which to allow would seem to be to nullify the requirement of the statute. But we do not consider it necessary to determine that question, because we think the case fairly taken out of the operation of the statute upon the well-settled ground of part performance of an oral contract for the conveyance of land, of which we shall speak hereafter. The importance of this testimony consists rather in its furnishing a strong and almost conclusive corroborating circumstance of the other testimony, showing that a parol agreement in fact existed for the conveyance of the land, notwithstanding some provisions of the leases which make strongly to the contrary, and which at first might seem quite inconsistent with the existence of such a parol contract.

These provisions contained in the leases constituted in the court below the stumbling block of the case, so far as complainants are concerned, and can only be explained, if at all, by the peculiar relation of the parties and the peculiar manner of their dealings with one another, by which Jacob Harman kept everything under his own control, and required his nephews to trust to his word.

These several leases executed by the parties, with the indorsements and extensions, are as follows:

### Lease of Jacob M. and O. P. Harman.

This agreement made and entered into on this the first day of March, 1875, by and between Jacob Harman, of Warren County, and State of Indiana of the first part, and Jacob M. Harman & Oscar P. Harman, of Iroquoise County and State of Illinoyse of the second part, (witnesseth) the party of the first part has this day rented or leased to the second party for the term of two years from this date, one cirtin tract or parcel of land lying and being in Iroquoise County and State of Illinoyse, It being the lands on which the second partys now reside known and described as follows (To-wit) N. ½ of N. W. Qr. Sect. Section 19, West ½ of Section 18, Range 10, and Section 13 Sect. 14 E. ¾ of Sect. 15—N. ½ of N. ½ Sect. 24—N. ½ of N. E. Qr. of Section 23 & N. E. of N. W. Sect. 23, Range 11 West all the lands in Town 25. The second party agrees to pay annualey as rent Twenty-two hundred dollars (2200.00) and all interest due on or before the first day of November each yeare, and replant at the proper time, cultivate and lay down and proon as directed by the first party and in good order all the planted on the West ½ of Section 14 & East ¾ of Sect. 15 all in town 25, Range 11 West, it being the field now in cultivation and called 800 acre field and to further do all the plowing necessary in replanting and cultivating the hedge around the pasture, allsoe to ceepe all fences, buildings and other improvements in good repair—it is further understood that the second party will replant, hoe and properly care for the hedge around the pasture and charge the first party one dollar per day for planting and howing hedge.

Given under our hands and seales.

This bring back for Jacob } Harman the other you keep. }

| | |
|---|---|
| Jacob Harman. | [Seale.] |
| Jacob M. Harman. | [Seale.] |
| Oscar P. Harman. | [Seale.] |

$1,500.00 September the 25th 1875.

Fifteen Hundred Dollars paid on the within artickal as part of the rent for the year 1875. Jacob Harman.

Rents cettled on the within for the year 1876. Jacob Harman.

The rents cettled on the within up to or for the year 1877. Jacob Harman.

Rents all paid on the within lands occupied by J. M. & O. P. Harman to March 1, A. D. 1879. Jacob Harman.

Rents all paid on the within article to March 1st, A. D. 1880. This Jany. 24th, 1880. Jacob Harman.

Rents paid or cettled on the within articul to March the first 1881.
Jacob Harman.

Rents paid as settled up to March the first 1882. Jacob Harman.

The rents paid on the within up to March the first 1883...................

October 30th, 1876, by agreement of the above named parties the foregoing article of agreement or lease is extended and to run until the 1st day of March 1878 J. M. & O. P. Harmans agrees in addition to the foregoing contract to replant plow and hoe all the hedge rows, allsoe to prune & lay down all the hedge as it may be needed, done as well as, ceepe all the fences repaired, all to be done in good order free from any additional charge. Given under our hands & seal.

Jacob Harman. [Seal.]
J. M. Harman. [Seal.]
O. P. Harman. [Seal.]

[Indorsed:] Rents and taxes is paid on the within up to March the first, 1884.

March 11th, 1878, the above or foregoing lease (made March 11th 1875) is by consent of parties extended until the first day of March 1882 on the following conditions (to-wit) Jacob M. & O. P. Harman agrees on their part to replant where necessary, and properly plow, hoe, cultivate, lay down, top & prune as directed all the hedge on all the land described in the foregoing instrument and also plow and drain the water from said hedges, as well as keep all the fencing in repair, the understanding is the work of hedge and fence is free from any extra charge. Also we agree to pay all rents and interest on or before the first day of Nov. of each year. J. M. Harman. [Seal.]
O. P. Harman. [Seal.]
Jacob Harman. [Seal.]

January 31st, 1882. By agreement of the above named parties which are Jacob Harman of Warren County, Indiana, party of the first part and J. M. Harman & O. P. Harman of Iroquois County & State of Illinois parties of the second part, do by agreement extend the original article to which this is attached and dated March 1st 1875, until the first day of March 1885, and the parties of the second part do agree in addition to the original contract, to replant, plow, hoe & cultivate all the hedge rows also to prune and lay down all the hedge, all to be done, as & when needed, also to keep in good repair all fences & buildings, all to be done without any additional charge. And Jacob Harman reserves the privilege to build a school house on north side of Section 13, T. 25, R. 11.

Given under our hands and seal. Jacob Harman. [Seal.]
J. M. Harman. [Seal.]
O. P. Harman. [Seal.]

January 31st, 1882. By agreement of the above named parties which are Jacob Harman of Warren County & State of Indiana, party of the first part & J. M. Harman & O. P. Harman of Iroquois County & State of Illinois, parties of the second part, do by agreement extend the original article to which this is attached and dated March 1st, 1875, until the first day of March, 1885. And the parties of the second part do agree in addition to the original article to replant, plow, hoe and cultivate all the hedges rows, also to prune and lay all the hedges, all to be done as & when needed. Also to keep in good repair all fences & buildings, all to be done without any additional charge. And Jacob Harman reserves the privilege of building a school house on the north side of section 13, town 25, range 11. Given under our hands & seal. Jacob Harman. [Seal.]
J. M. Harman. [Seal.]
O. P. Harman. [Seal.]

[Indorsed:] The within article has been settled and all rents paid to March the first, 1885.

Whereas, the above lease and article of agreement entered into by and between Jacob Harman of Warren County, State of Indiana, of the first part, and J. M. and O. P. Harman of Iroquois County, State of Illinois, of the second part commencing March the first, 1875, and extended and re-extended to March the 1st, 1885, as evidenced by the above written articles will expire on March the first, 1885. Witnesseth, that it is hereby agreed by and between both parties that the same shall be extended on the same terms and with all the provisions and restrictions therein contained commencing March the 1st, 1885, and to continue from year to year on the following conditions (to-wit): That the said parties of the second part will quit and give up possession of said premises at the expiration of any one year in case the party of the first part should sell or convey all or any part of said lands, or in the event that either party should die or become dissatisfied or in case of the party of the second part failing to pay all or any part of the yearly rents or interests on or before the first day of November of any one year. And it is further agreed, that the party of the second part shall keep in good repair the houses and other buildings, also fences, hedges, hedges, drains, &c., without any further charges for the same. In witness whereof, we have hereto set our hands and seals this 24th day of October, 1884.

Jacob Harman. [Seal.]
J. M. Harman. [Seal.]
O. P. Harman. [Seal.]

### Lease of J. R. Harman.

This article of agreement made and entered into this, the first day of March, 1875, by and between Jacob Harman, of Warren County & State of Indiana, of the first part and Jeremiah Harman of Iroquoise County and State of Illinoyse of the second part (witnesseth): The party of the first part has this day rented or leased to the second party for a term of two years commencing with this date, one cirtin tract or parcel of land lying and being in Iroquoise County and State of Illinoyse, it being the land on which the second party now resides, known and described as follows, to-wit: Southeast fractional Qr. section, east fractional half of northeast Qr., allsoe southwest Qr. of northeast Qr., all in Sec. 7, town 25, N., range 10 west. For the field laying on the south part of said lands together with the building and all other improvements thereto belonging at the following specifyed yearly rents, to-wit: For one hundred and twenty-five acres (125) of said field at three dollars per acre a yeare, twenty-five (25) acres at one dollar per acre, the balance of the field called slue or pond free of rent supposed to be 5 acres. The second party is to sow the S. W. corner of said field to meadow and grasing, and allsoe all rents an interest to be paid on or before the 1st day of each yeare. And further, the second party is to do all the necessary plowing plowing, for the hedge free of charge. The first party agrees to pay one dollar per day for planting and hoeing hedge. Given under our hands and seales.                Jacob Harman.   [Seale.]
Jerry R. Harman.   [Seale.]

[Written on side:] It is further agreed by the parties of this lease, that the pasturing of cattle on Ind. side is marked out by agreement.

Jacob Harman.
Jerry R. Harman.

The rent only cettled on the land for the year 1875.

The rent is cettled on the above lease up to March the first, 1877.

The rent is settled on the within lease up March first, 1878.   Jacob Harman.

The rent for the lands for the to March year, 1879, is paid also for the grasen is cettled for the same.                Jacob Harman.

October 10th, 1876, the above article of agreement or lease by agreement of the above partys is extended to March the first, 1878, and the following aditions made to it, to-wit: The approve named Jeremiah R. Harman agrees to replant, plow and hoe in good order, all the hedge in and around the above described field free of any additional charge, and alsoe keepe up and repair all the fencing around said field free of charge. And pay the same rent as described in the above foregoing article.

Given under our hand and seale.

Jacob Harman.   [Seale.]
Jerry R. Harman.   [Seale.]

March 1st, 1878, the above or foregoing instrument dated March 1st, 1875, is by consent of parties extended until March 1st, 1882, on the following conditions, to-wit: Jeremiah R. Harman agreed to do, without extra charge, replant, plow, hoe, top, lay down, prune & allsoe plow and drain watter from the hedge where it is necesary, the worck to be done in good order, and in the manner as directed.

Given under our hands and seale.　　　　　　　Jacob Harman.　　[Seale.]
　　　　　　　　　　　　　　　　　　　　　　 Jerry R. Harman.　[Seale.]

[Indorsed:] The rents is cettled on the within leas leas up to March the first, 1880.　　　　　　　　　　　　　　　　　　　　　　　 Jacob Harman.

The rents and all is cettled up to March the first, 1881.　　　 Jacob Harman.

The rent is cettle on the within up to March, 1882.

Rent paid on the within up to March the first, 1883.

The following is an adition to a lease made in the year 1875 and an adition made in the year 1878, by Jacob Harman of Warren County, Indiana, to Jeremiah Harman of Iroquoise County, Illinoyse. Now, Jacob Harman makes this additional lease to to the following described lands, to-wit: Twelve (12) rods off of south side of lots No. forty-one (41) and lot No. forty-two (42), in section six (6), allsoe the east half of fractional section seven (7) and the east half of fractional sectional section No. eighteen (18) all in township twenty-five (25) north, range ten (10) west. J. R. Harman agrees to pay anualey as rent on or before the first day of November each yeare for the said premises five hundred and fifty dollars and ceepe up all repairs of improvements and give the hedges all the cultivation and triming necessary without any extra charge. Jacob Harman agrees to pay the tax on all the personal property on said lands but will not pay for any improvements or repairs that may be done. Given under our hands this the third of February, 1881.　　　　　　　　　　　　　　　　　　　　 Jacob Harman.
(O. P. Harman.)　　　　　　　　　　　　　　　　　　　 Jerry R. Harman.

This article of agreement made and entered into on this the 10th day of January, 1882, by and between Jacob Harman of Warren County, Indiana, of the first part, and Jeremiah R. Harman of Iroquoise County, Illinoys, of the second part, witnesseth: The party of the first part has this day rented or leased to the second party for the term of two years comencing March the 1st, 1882, (unless either of the party should dye before the experation of the time then the lease to close with the year of such death). The following described lands in Iroquoise County, Illinoyse, known and described as follows, to-wit: Twelve (12) rods off of the south side of lot No. forty-one (41) and lot No. forty-two (42) in Sect. six (6), allsoe the east half of fractional section No. seven (7) and the east half of fractional section No. eighteen (18), all in township twenty-five (25), north of range 10 ten west. J. R. Harman agrees to pay anualey a rent on or before the first day of November each yeare, five hundred and fifty dollars (550) and ceepe up all repairs on buildings, fencing, &c., and give the hedge all the cultivation, care and triming necessary for it without any further charge and Jacob Harman will not pay for any additional building or improvements on the land. Given under our hand and seale.　　　　　　　Jacob Harman.　　　[Seale.]
　　　　　　　　　　　　　　　　　　　 Jeremiah R. Harman.　[Seale.]

[Indorsed] The rents is paid on the within leas up March the first, 1884.

July the 2nd, 1884. Received of Jacob Harman, of Warren County, State of Indiana, one hundred and fifty dollars, part of it to pay the taxes on the personal property that is on east half of section seven (7) and east half of section 18, town 25, R. 10 W., all in Iroquoise County, State of Illinois.
　　　　　　　　　　　　　　　　　　　　　　 Jeremiah R. Harman.

Whereas, the above lease and article of agreement entered into the first day of March, 1875, by and between Jacob Harman of Warren County, State of Indiana, of the first part, and Jeremiah R. Harman of Iroquois County, State of Illinois, of the second part having been extended and re-extended to March the 1st, 1884, did expire on said date. Witnesseth, that it is hereby agreed by and between both parties that the same shall be extended from March the 1st, 1884, to continue from year to year with all the provisions and restrictions therein contained and with the following conditions, to-wit: That the said Jeremiah R. Harman is to have in addition to the lands now occupied by him, lot No. one, northeast corner

of section (19) nineteen, all in town (25) twenty-five, north of range (10) ten west, in the State of Illinois, by paying an additional yearly rent of fifty dollars, making in all a yearly rent of six hundred dollars; and that the party of the second part will quit and give up possession of said premises at the expiration of any one year in the event that either party should die or dizsatisfied, or in case the party of the first part should sell or convey all or any part of said lands. Or by the failure of the party of the second part to pay all or any part of the yearly rents or interest on or before the first day of November of any one year. And it is further agreed, that the party of the second part shall keep in good repair all buildings, fences, hedges and drains without any further charge.

Given under our hands and seals. This 31 day of Oct., 1884.

Jacob Harman.  [Seal.]<br>Jeremiah R. Harman.  [Seal.]

### Exhibit E.

March 1st, 1878. And further, it is agreed in connection with the aforenamed extention (bearing even date herewith) by & between the said parties, Jacob Harman of the first part and Jacob M. Harman & O. P. Harman of the second part, that Jacob M. Harman is to fence a field north of creek on the northwest ¼ of section 18 eighteen, town 25 north, range 10 west, and to have use of same during the term of said extention of lease. And to put on same not less than one hundred & fifty rods of tile of sizes & depth sufficient to drain same & to plant & cultivate a hedge around same to the best advantage to make a good hedge. Also further to plant and cultivate a grove on said land north of creek of soft maple or some other suitable plants or timber of not less than five acres. All to be done at the expense of said Jacob M. Harman without any further charge, for which the said Jacob Harman has this day paid unto the said Jacob M. Harman the sum of fifteen hundred dollars. And further, it is agreed that the said Jacob M. Harman may fence a field north of creek and cultivate same on N. E. ¼ of section 13, town 25 north, range 11 west, by hedging and tiling that part which he may fence and cultivate as said Jacob Harman may direct. And that the same is not to interfere in no way with the amounts to be paid unto said Jacob Harman as specified for rents in the original contract.

Jacob Harman.  [Seal.]<br>J. M. Harman.  [Seal.]<br>O. P. Harman.  [Seal.]

It cannot be questioned that some of the provisions of these leases, especially that contained in the last extension, of October 24, 1884, are inconsistent with the idea that any contract existed between the parties, by which the nephews were to have the lands. There are two ways of regarding the case. One is that adopted by the court below, of viewing the leases as the only contract between the parties, because nothing else was put into writing, and that all that was unwritten became at last merged in the last extension of the lease, which served to define and settle forever the real relation of the parties in regard to the lands, as being simply that of landlord and tenant. The other way of looking at the case is to consider all the testimony, oral as well as written, to determine what the understanding was, and, if there be inconsistencies, to reconcile them as best we may, and so, upon the whole evidence, to determine the real facts. If this may be done, we have not much hesitation in finding, notwithstanding these inconsistent and contradictory provisions in the leases, that the evidence, taken as a whole, shows that it was the understanding and agreement, all through the years the complainants were in possession, that if they improved the lands, paid the stipulated rent, and 10 per cent. interest on the money borrowed of Jacob Harman, so long as he lived, the principal of which they had

in large part put into improvements upon the land, the land itself was to be theirs in fee upon the uncle's death, and that to require them to pay the judgments, which we think they must, which were rendered against them upon the notes given for personal property sold, and borrowed money put into permanent improvements upon the land, and at the same time to deprive them of the land, as well as the improvements, would be to do them an injustice, which a court of equity should willingly avoid, if it may be done upon sound and recognized principles of equity jurisprudence. The account which the complainants and the witnesses give of the transaction, all of which is strongly corroborated by the making of several wills and the deeds for the conveyance of the land, is substantially as follows: Jacob M. Harman, testified:

"During my boyhood I resided with my father in Randolph county, Missouri. I lived there from the time I was born, the 31st day of December, 1841, until I left there, in the month of January, 1862. I removed from there at the request of my uncle Jacob Harman. Jacob Harman told my father and I that, if I would go and live with him, he would make me, at his death, his principal heir. That is what he told me at that time. He was a single man, never was married. That was in the month of January, 1862. I was entering in my twenty-first year. I went to live with my uncle. When this matter was talked over, Jacob Harman was at my father's place in Missouri. When I left Missouri, I went to the residence of my uncle Jacob Harman, in Warren county, Indiana. I remained there with him, and worked for him on the place, until the fall of 1864, when he sent me back to Missouri, to take charge of my father's farm, and my father removed to Warren county, to take charge of his farm. My going back to Missouri was a temporary arangement made by Uncle Jacob Harman. The arrangement was that I should go back to Missouri, and take charge of my father's farm, and arrange for him to move to Indiana, to take charge of uncle's farm for him. I stayed in Missouri until the spring of 1870. At that time the Missouri lands were exchanged for some lands in Benton county, Indiana. Then I removed to Indiana, and stayed on the Benton county land for that year. And in the spring of 1871 I moved to the land in Iroquois county, Illinois. The lands were in township No. 25 north, of range 10 and 11 west, and 40 acres in range 12 of the same town. I moved onto the lands in Iroquois county at the request of my uncle Jacob Harman. The arrangement was that I should move on these lands, and help uncle to improve them, and at his death all his Illinois land should be mine, except 840 acres on the west end of the place, which he had already arranged should be my brother's. That is plainly what he said,—that I should move onto the land. He wanted me to move onto the lands, and I did move onto them, with that understanding. That is what he said,—that if I would move on them, and help him to improve them, at his death that land should be mine. I consented, and did so. That arrangement was made in the year 1870. We talked in regard to the matter several times, and the talks were all substantially the same,—I should move on to them,—and in the spring of 1871 I did so. In the fall of 1866 I sold uncle a bunch of cattle,—a hundred or more head. I do not remember now, but it was 100 or more, which I was to deliver to him at Quincy, Illinois, in the spring of 1867. Before the time came for the cattle to be delivered at Quincy, uncle wrote me to come to Danville. He wanted me to come on with the cattle to Danville, Illinois. When the time came for them to be delivered, I went with the cattle to Danville. He wanted me to go to Danville, and he wanted to see me on some business. I went to Danville, and met him. He at that time made arrangements with me that he would put up a house on the Illinois lands, on which I should move in the spring of 1868. It was to be built on section 14, township 24, range 11. The house was built, but, before the time came for me to move, he wrote me that it would be best to remain on the Missouri lands until they could be disposed of, whereas, if I left them, the improvements would go down, and father would not realize as much for the land as he would if I stayed and kept the improvements up. I moved upon the lands in Iroquois county, Illinois, in March, 1871. When I first went there,

there was an agreement between Uncle Jacob and my brother Oscar and myself that we should form a certain portion of these lands in partnership with uncle,—that is, we were to give uncle one-fourth of the profits from the place; and we worked the lands in the same way in 1873 and 1874. We continued on and improved more of the lands, and paid him one-fourth of what we made on them each year during those four years. Then, in the fall of 1874, uncle said he did not want any further bother in regard to the lands. During the years 1871, 1872, 1873, and 1874, he had helped us to pay for the improvements put on during that time, but there was not any great amount of improvements put on during that time. There had been some hedges started, which we kept up, and he paid us for most of the work we done during those four years; but in the fall of 1874 it was arranged between us that in the spring of 1875 we should enter into a lease, by which we were to pay him a certain rental for this land during his life. The agreement with him was, we should go onto those lands and improve them at our own expense. In the fall of 1874 it was arranged that we should take the whole land under our own control, and continue to improve them, and pay him a certain rental on them during his life, and at his death the eight hundred and forty acres on the west end of the place should be Oscar's, and the rest mine. That agreement was never put in writing. It was agreed that the amount of rent should be $2,200 each year, to be paid by Oscar P. Harman and myself, for 2,440 acres. This agreement was made in the fall of 1874, but the leases, which were to secure him his rent, were dated March 1, 1875. All that time he let Oscar and I have $15,000. When Oscar P. Harman and myself settled on this land, in 1871, the west 800 acres had a hedge around it, and two cross hedges on the high land. The hedge was not set on the low land. I could not say just how long that hedge had been set out, but I should think about two years. This west 800 acres had a three-board fence all around it. The forty acres at one corner of the 1,600 acres was inclosed, along with the 1,600 acres, in one pasture. It had a three-board fence on the south side, and on the east end for about three-quarters of a mile, where it connected with the fence of Mr. Sumner. Sumner's fence then continued on north on the east side, and all the way along the north side. Some of the land on the west 800 acres had been broken up, but none at all on mine,—the east 1,600 acres. There was a grove of about seventeen to twenty acres. Inside of the grove it had been plowed.

"Jacob Harman's principal reason for wanting the lands improved was, so that he could get more rental for them. He said that the lands, being improved, would be worth more to him; and, further than that, I think he wanted to help us boys. When we went there, in 1871, Jacob Harman had some personal property on the place. He put a value on it, and turned it over at that value. I could not now state what the amount was, but it is in our first contract. I have got that contract at home. The amount named in my bill is correct. The amount named in my bill is the amount that is in the first contract; the amount that he turned over in 1871. When I went there, in the spring of 1871, the east half of section 7, town 25, range 10 west, except the northwest quarter of the northeast quarter thereof, were idle, and inclosed in Mr. Sumner's pasture. During the summer of 1871, Uncle Jacob proposed to me that we fence those lands, and make some use of them. He made the proposition that he would furnish the material to build the fence, if I would haul it and build it; that he would furnish the material to build the house, if I would haul the material, and he would pay the carpenter for building it. I hauled the material, and the fence was built; and I hauled the material, and the house was built. Uncle leased that place for 1872 to a man named Gallup, and again to the same man for 1873 and 1874. During February, 1874, Gallup sold everything he had on the place, except what he had in the house. He had possession of the house, and we could not get any satisfaction as to what he was going to do. If he did not farm the place, uncle would get nothing from it, because the rent came from a part of the crop. About the 1st of April, 1874, I went to see Uncle Jacob Harman. While I was there it was arranged between father and Uncle Jacob that if I could get possession, when I returned to Illinois, that my brother Jeremiah R. should go out and farm that place for that year. When I got back I got possession of it by paying Gallup $100. I then notified uncle what I had done, and my brother Jerry came out and took possession of the place, and farmed it for that year. During the fall of 1874, when my uncle was out there to my house in Illinois, my brother Jerry

R. wanted to move to Indiana, to father's, as he was not satisfied there; but uncle seemed to want him to remain and do something for him, and uncle proposed to me that he would pay me for the improvements, the work which I had done on that piece of land, if I would surrender it and let him give it to Bob. That if Bob would stay on the lands, and improve them at his own expense, and pay him a rental on them during uncle's life, that at his death the lands should be Bob's. Uncle paid me for what work I had done on it, and he made that arrangement with Bob,—that the lands should be Bob's at uncle's death. Thereupon I surrendered this tract of land I have described, together with lot 41 in section 6. In the spring of 1880 uncle sold some lands to Edward C. Sumner,—the lands that laid over the state line, on the Indiana side. He got from Mr. Sumner some lands in Illinois, next to the state line. And, after he got those lands from Sumner uncle wanted me to release the north half of the northeast quarter of 19, for him to give it to Bob. I mean by Bob my brother Jeremiah R. Harman. He told me that Bob should pay me for the improvements which I had put upon the land, and should pay him rent during his life, and afterwards Bob should put on whatever improvements he pleased; that if I would release them he would turn them over to Bob, the same as he had the other land. J. R. Harman paid me $60 for the improvements. At the same time he wanted me to release the southeast quarter of the northwest quarter, and the northeast quarter of the southwest quarter, of section 24, town 25 north, range 11 west, which lie immediately south of the main body of lands, which he gave to a minor in Virginia by the name of John H. True. I surrendered that land. I had not made any improvements on it. Jacob Harman was 81 years old when he died, in February, 1885. In the spring of 1875 an arrangement was made between Jacob Harman and J. R. Harman and Oscar P. Harman and myself as to dividing up the lands up between us. The east half of the west half, and the east half, of section 15, and the west half of section 14, and the northeast quarter of the northwest quarter of section 23, town 25, range 11, were to be Oscar's. The west half of section 18 and the north half of the north half of section 19, town 25, range 10, section 13, the east half of 14, the north half of the northeast quarter of 23, and the north half of the north half of section 24, and the southeast quarter of the northwest quarter, and the northeast quarter of the southwest quarter, of section 24, town 25, range 11, west, were to be mine, with the southeast quarter of the northeast quarter of section 16, town 25, range 12. Lot 41 of section 6, and the southeast quarter, and the east half of the northeast quarter, and the southwest quarter of the northeast quarter, of section 7, should be Jeremiah R. Harman's. We all took possession of these lands. We went on and improved them and farmed them, and paid him his rent as we agreed.

"This has reference to the 1st of March, 1875, as I understood it. These lands were embraced in the leases which have been introduced in evidence, excepting the north half of the northeast quarter of 19, town 25, range 10, and the southeast quarter of the northwest quarter, and the northeast quarter of the southwest quarter, of section 24, town 25, range 11, and the southeast quarter of the northeast quarter of section 16, town 25, range 12. The lease that has been introduced in evidence is in the handwriting of my father, Anthony Harman. I do not now remember that there was anything particular said as to the lease being drawn for a period of two years. Only it was understood it should be extended from time to time during his life on the same terms, and with the same amount of rental. After I took possession under this agreement, I did, in the spring of 1877, rebuild all the fencing on the south side of the place. I set it far enough in to leave out a road, and leave the hedge on the outside of the fence. I set a hedge all along the south side, for two miles, with the exception of a few rods on the east end. My recollection is that I put upon the place about five and three-quarters miles of hedge. I do not think it cost less than $2 a rod. I put not less than eight or nine miles of board fence on the premises. I have before stated that I think a panel of board fence would cost $1.85 or $1.90 a panel. I have since been figuring on it, and do not think that it would cost that much. I think it would cost $1.60 or $1.65 a panel of sixteen-foot board fence. A panel won't make a rod of sixteen-foot boards. I constructed about 220 rods of ditches. I paid forty cents a rod for that ditch, besides having four horses and a man at work helping to do it. I put in not less than 500 rods of tile drains. It ranged in size from five to eight inches. Most of it is five and

six inches. There are about sixty or seventy rods of it,—that is, eight inch. The work of putting it in would cost me ten cents per foot per rod, and the tile would average about three feet in depth. The price of the tile I do not now remember. It was much higher then than it is now. The eight-inch tile cost me $1 a rod at the factory. I do not think all the tile, to take it straight through, would cost me less than $1.15 a rod. I think I have put the price small. I think the cost was more than that. I have not figured lately as to what the cost would be. I put an addition to the house of three rooms, which cost somewhere between $400 and $500. I put up a building in the yard, with a cellar under it, that cost something near $500. I built another dwelling house on the premises that cost $700. That is my recollection now. I built several cornericbs on the place, and I should not think they would cost less than $700 or $800. I put up small sheds for coal at an expense of perhaps $70. I built a granary which probably cost $100 to $120. I put up a shed and machine house that cost $160 or $170. I set out two orchards,—one orchard of about three and a half or four acres, and another down on section 14, which was partly out when I went there. I filled it in,—kept filling it in. The large orchard, up east, did not cost me less than $200, may be $250, besides the work of caring for it. On the east 800 I put out a grove of seven acres of soft maple. Most of these improvements were made between the spring of 1877 and 1885. I had the means to make these improvements. The money that Uncle Jacob had furnished my brother Oscar and I, with what money we made since we had been at work upon the farm. This $15,000, and more than that, was put into the place, in the shape of improvements. We used that money for that purpose. At the time this lease was made we had a talk in regard to it with Jacob Harman. That is, the understanding was the lands should be ours. The talk was that the land should be ours at the death of Jacob Harman, as I have said, and that we should pay him the rent that is named in the lease each year during his life for the use of those lands. The lease was made to secure him his rent. I had an interview with Jacob Harman about this lease along in the month of October, 1884. In the fall of 1884, uncle wanted us to sign a new extension to our lease, to commence March 1, 1885, and he had it prepared. As prepared, it was not at all as our understanding was what the lease should continue to be. The lease was in the handwriting of Jacob M. Harman, of Benton county, Indiana. He claimed that he wrote it under the instructions of Jacob Harman. We did not want to sign it the way it was. Uncle substantially told us that it would make no difference as regards our right,—the signing of it. That he intended that we should have the lands just as he had agreed with us that we should. He presented it to us at his house. He sent for me to come to his house in Indiana. I do not know that he sent for me especially as regards that lease, because he was sending for me every two or three weeks continually during the whole year of 1884. During one of these times while I was there, he first spoke in regard to this extension. I do not remember that any one was present when he spoke to me in regard to it. I do not know whether he then had it in his possession. It may have been talked about before I saw the copy. It may have been talked about between J. M. Harman, of Benton county, and myself before I saw a copy of it. I saw it on October 24, 1884. Oscar and I had a talk with uncle in regard to it at that time, and Bob was there later. When he signed it, on October 31, 1884. My objection to signing it was that it was not as it was agreed the extension should be. The conversation referred to was at the time we signed it. The evening before, or morning. We may have got there on the day of the 24th, and signed it in the evening, and we may have signed it on the 25th. I do not remember that anybody was by, except myself, my brother, and Jacob Harman. My objection to signing it was because it was not as our former understanding had been that the extension should be made. He replied to that, that it should not interfere with any of our rights with regard to the premises or lands; that he intended the land should be ours; that he intended we should have the lands, just the same as we had agreed. The mental condition of the old man at that time was bad. I do not know that I can describe it any further than he was very irritable and childish, and in fact we thought that he was insane. We always tried to do just as he directed us in everything, because we did not dare to do different. We did not dare to do different, because we had gone to work on those lands, and expended a large amount of money, and our interest was

such that we did not dare to do anything different than what his wish was, for fear that he might do something that would be detrimental to our interests. That was one reason why we humored him at that time. Q. You mean to say, then, that you and your brother just merely signed this extension simply because he wanted you to? (Objected to.) A. That is what I aim to say. Yes. Q. Did you ever refuse to sign any paper that your uncle asked you to sign? (Objected to.) A. I never did. This extension was to take effect March 1, 1885. Uncle Jacob Harman died before the expiration of the previous extension. Jacob Harman was accustomed to direct us as if we were his boys. He always did at all times,—as if we were his boys. I did not have any talk with him in the last months as to the titles to the land. I did not talk with him anything about the will. He wrote for me at one time to come in the month of August, 1884, and it was immediately after Joseph L. Harman of Iowa had been there, and at the time I was there he spoke to me with regard to wanting to rewrite his will. The will which was then in existence we believed was a will which he had made in 1882. We did not know that he had made one since. I asked him why he wanted to rewrite his will. He said, 'I have always been leaving the residue of my estate to the American Bible Society, and I now believe I will change it, and, in place of leaving it to the Bible society, I shall leave it to the nephews and nieces of my other brothers.' The Illinois lands, when I went on them, were not worth to exceed $13 to $15 an acre. In 1885 they were worth at least $35. Possibly could have been sold for more. We never asked Jacob Harman to pay for any more improvements, for it was understood that he would not pay for any more, and in the winter of 1875 he said he would not pay for any more improvements; that, whatever improvements we wanted to put on them, we could put on at our own expense, because the lands were ours, and we could make the improvements ourselves. I did not put the improvements upon the land with any idea that I was putting improvements upon the land of Jacob Harman."

On cross-examination he testifies:

"The arrangement was made and the lease was signed in the fall of 1874. The arrangement was talked over and understood before the lease was drawn up. I signed the original lease and the various extensions that are attached to it. The original lease, dated March 1, 1875, is in the handwriting of my father, Anthony Harman. The extension dated October 30, 1876, is in my father's handwriting. The one dated March 1, 1878, is my father's, except the bottom, which is mine. The extension dated January 31 1882, is in my handwriting. The last extension is in the handwriting of Jacob M. Harman, of Benton county. The various receipts on the lease were all signed by my uncle Jacob Harman. The date in the last extension is in my handwriting. I never objected to signing any paper that my uncle desired me to sign, except this last extension or lease. I never objected to any prior lease or extension, because those leases were for no other purpose than to secure him his rent. That was the intention and understanding of those leases and extensions. I say that because he said so. That was the understanding in the first place made in 1874. The lease was to secure him his rent. That was a part of the verbal contract, and there was a written lease to follow. He wanted it to secure to him his rent. My brother and I got this $15.000 on March 1, 1875. There was no writing executed at the time, aside from the note. He had furnished us the money to pay for our three-fourths interest in the cattle we had on the place, and he owned one-fourth of the cattle. On the 1st of March his one-fourth of the cattle was appraised, and the amount which he had furnished us to put in our three-fourths of the cattle was added to it, with interest which had accumulated on it, and one-fourth of the feed that we had on the place was added to that; and those items together, and may be some money that he paid to us, made the correct sum, together with the amount of horses and things that he turned over to us in 1871 under the first contract."

The testimony of Oscar Harman and Jeremiah R. Harman is substantially the same. In regard to the extension of the lease made in October, 1884, Jeremiah R. Harman testifies:

"I was present in the fall of 1884, when the extension of this lease was under consideration. J. M. Harman and myself went together. I have seen the extension signed October 24, 1884. I signed it along with Jacob Harman. At the conversation between Jacob M. Harman, Jacob Harman, and myself, about that extension, I said it was different from the way I understood it, that our extensions would be, or had been all along. He wanted to know why. I told him it looked as though he could dispose of the lands, or any part of them, if he was a mind to, according to that. He said it was like the others; or I think the other two parties, is the way he termed it. He said it should not interfere with any of our rights in any of our lands, and he wanted us to sign it. We did so. We objected to doing it in that way. I told him that it looked as though it would give him a right to sell the land. We boys talked over the question as to whether we had better sign it, between ourselves, and concluded that his mind was not right, and it would make him mad not to sign it, and we didn't know what he might do if we did not sign it. J. M. especially insisted that we had better sign it, and that it would not do not to sign it, and in that way we signed it. I am not an expert on insanity. His mind appeared feeble, and he was weak; that is, much more so than I had ever seen him before. I told the boys that he was not right at all. My view was that he was partially crazy."

Jeremiah R. Harman testifies in regard to the improvements he put upon the land he claims, and in regard to the last extension of the lease, as follows:

"In the fall of 1874 I built an addition to the house, of two rooms and a pantry, and dug two wells, and made about a mile and a half of board fence. In the spring of 1875 I made considerable more fence. I do not remember just how much. And along in the summer I threw up some hedge rows in the low places around the field on the south end of the east half of section 7, and finished out the hedge fence around the field of about 180 acres of the south end of the east half of section 7, and also ditched along the south hedge, and part of the way on the north hedge, to an open ditch that was partly made in 1874. During August and September I built a barn 32x36 feet, at a cost of $550, and did some repairing on the farm. I do not just now remember how much. In the spring of 1876 I put out an orchard of about an acre and a half, and put out with it a grove of soft maples and some willows. That was in some low ground. I tended the hedges during that year, and made some ditching. I do not now remember just how much. In the spring of 1877 I fenced the balance of the east half of 7, and lot 41, with an oak-board fence, and built another addition to the house at a cost of about $400, and kept up the repairs on the farm and other necessary improvements where needed; and so I continued until the year 1880, when I built a granary at a cost of $250, and made some corncribs, about eighty feet long and eleven feet high and ten feet wide. In 1881 I made three ditches on the east half of 18 about half a mile long each. The ditches were measured by Mr. Nolin, whose evidence has been taken. In 1883 I tore the house all to pieces, and built it over again, at a cost of $1,500, and made a very large shed for calves and young cattle. I believe it was 20x70 feet. I also made a cow shed that year. In the year 1878 I dug a very large cistern, at an expense of $100, and built an ice house, at an expense of $100. In 1875 I built a hen house, and kept making additions to it until it got to be quite a building. I do not remember now just how much it cost, but I think, all told, it was about $100. In 1878 I fenced the garden in, at an expense of $80, when I put out an orchard and a grove of about an acre and a half. There is about five acres in the orchard and grove, all told, including evergreens in the yard and small fruits of all kinds. I constructed three miles and a quarter of osage hedge on the east half of section 7, and a mile and a half surrounding the north half of the northeast quarter of 19, town 25, range 10 west. There is about five miles of board and wire fence, mixed, on the premises. It costs about $1.50 a rod to put up that mixed fence. There are about two and a half miles of wire fence, that costs about 75 cents a rod. I estimate all the improvements I had made on the place in the spring of 1885 to be worth about $11,000. I estimate them to be worth that. It cost me more. There is a great deal of improving always to be made on a farm that don't show much, and

cannot be estimated as worth anything, but then it cost something to make it. I resided on the premises from April 14, 1874, to March 18, 1885. I moved to the northeast quarter of section 14, town 25, range 11 west.  *  *  *  After that I saw Jacob Harman about the extension, on the evening before I signed this lease. That was, I think, on the 30th of October, 1884. I said to Jacob Harman that this lease spoke something about releasing the land on certain conditions, and that was not according to our agreement. He said that he had had J. M. Harman and O. P. Harman's prepared in the same way, and he did not intend that should interfere with our rights in the land, and that he did not intend to convey or sell the land, but he had the lease drawn up in that way. That his business was bothering him a good deal, and he would like for me to sign the lease as it was. His physical condition at that time was weak. He seemed to be somewhat wavering, and very irritable and fretful. At times he was kind,— seemed to be himself,—and other times he would imagine his neighbors were contriving against him. He was very hard of hearing, and his powers were failing; and, as I never objected to doing anything that he really insisted on my doing, I told him that I would sign the lease, and did so. He assured me that it should not make any difference in my rights, and that he did not intend to take the land away from me; that he had given it to me. That he often told me. He told me in the early part of the year 1882 that he had deeded all these lands to me that I had, mentioning twelve rods off of lots 41 and 42 in section 6, and the east fractional half of section 7, and the east fractional half of section 18, and the north one-half of the northeast one-fourth of section 19 in town 25, range 10 west. He told me in the early part of 1882 that he had those lands all deeded to me, and that I should get the deeds at his death; and I never, after that, bothered myself much about his will. When I got this land in section 19 from J. M. Harman, the hedge had been set out and tended for three years, but was not half a fence. I laid the hedge down, and kept it pruned and trimmed from that time up to the death of Jacob Harman. I put about fifty or sixty rods of wire fence on the place, and made about eighty rods of open ditch. I paid all the rent that was due Jacob Harman up to March 1, 1884."

Jordan Roberts, a neighbor and friend of the Harmans, testifies:

"I am sixty-six years old, and live in Warren county, Indiana. I am a farmer.  *  *  *  I first became acquainted with Jacob Harman, deceased, in Warren county, in 1847.  *  *  *  He frequently talked with me with reference to his Illinois lands, and their occupancy by the three sons of Anthony Harman, and as to his Indiana lands. I had conversations with him during the year 1884 with reference to the extension of the lease made that year with the boys in Illinois. I often talked with him, or he would with me, about his boys. I had these conversations with him about the extensions of the leases in his room. It was upon the occasion when I went up there, and the boys had been in there, and he always would tell me when they came in there. I mean, by 'being in there,' they came in from Illinois, and he told me they came in, and they objected to renewing the extension on account that they thought it would put them out of their land, some way; and he said that 'I guarantied them that I wouldn't do it,' and that that was their lands, and then he said, after they had considered it, they signed this extension. I told him that was all right,—that I reckoned the boys wanted to do right about it,—and I know he did. I only said that to keep him quiet. He said that was their lands, and nobody else's. I heard him say it at different times during his sickness. . I cannot say how long, but at different times he talked about his business. About this extension matter, I don't know just how long it was before he died. I cannot remember, because I never expected to be called upon in a controversy about it. As to the extensions, he told me this: He said he had rented it to them from year to year,—their lands,—and they came in and paid their interest and their rents; and I asked him how much interest they paid him, and he said ten on their notes, and he said that was to keep up his little charitable purposes. I did not ask him what that was. He told me the lease was a contract for the land from year to year. He said the boys refused to sign it, for fear it would get them out of the land he gave them. He said they told him that they did not want to sign it until he told them about the land that was their land, and nobody

else's. They objected to sign it when he presented the leases until they found out about it. The way they found out about it, he told them. He went on and fixed it up just as he always had done."

Benjamin F. Spears, another neighbor, who had been acquainted with Jacob Harman since 1854, testifies:

"He said he was going out to see how the boys were getting along; they were improving a good deal, and he wanted to see how they were getting along. He said he was going out there to see how the boys were getting along with their improvements, and I said, 'Why don't you let the boys come and see you?' And he said he would like to ride out, anyway. And I said: 'What are you going to do with all this land when you die? You are getting old, and you will die pretty soon.' And he said: 'I haven't much land, any more. The land belongs to the boys. I gave that land to Anthony's boys, but they pay the old man a certain rental during his lifetime.' "

John J. Harman, a brother of complainants, testifies to a conversation had with Jacob Harman in 1884 about the refusal of the three nephews to sign the last extension of October, 1884, as follows:

"I had a conversation with my uncle during the fall of the year previous to his death, in which he spoke in relation to leases existing between himself and my brothers in Illinois. The way that conversation came up, he sent down for me, and I went up there, and we were talking about the boys being in, and about having those leases prepared for them, and he said they refused to sign them until he made it satisfactory to them; that it was all right for them to sign them; that the land there was all to be theirs, anyhow; that it would make no difference that it had been given them; that they then signed them. * * * I have heard him say what the arrangement was, under which the boys were on those lands in Illinois. He said they were to go ahead and improve the lands at their own expense, and that he was not going to put any more improvements on them. They would have to do the improving, and at his death the land would be theirs. He said they were to pay him a rent, also, until his death."

And on cross-examination he says:

"The old gentleman told me that they refused to sign the leases until he had made the thing satisfactory; that it would not interfere with what had already been given. That is exactly what he told me."

N. Z. Wiley, an attorney, in whose office the land trade with Sumner was made, testifies:

"Jacob Harman said to me on that occasion that these boys (that is the way he designated them) went to Illinois, there, at his solicitation, to improve those lands, and he had an agreement with them that they should occupy those lands and improve them, and pay him a rental upon them, for which he said he had contracted with them during his lifetime, and at his death the lands were to go to them; and when it come to making the deed either to Jacob M. Harman or Oscar Harman, which included a larger tract of land than either of the others, I spoke to him, and asked him why it was that under this arrangement one of these boys was to get much more land than the other. He explained it this way, whichever one it was. I think it was Jacob M. I am not certain. He said he went out the first of any of them, when it was a raw country."

Ira Brown, the attending physician of Jacob Harman, testifies to a conversation had with him in 1877, as follows:

"He made the remark that he didn't think that he would ever put out another rod of hedge. I said: 'You are putting out a lot of new hedge, aren't you? I see there is a mile or two of hedge coming out on the south side of your farm now.' He said: 'No, he was not putting that out. Matt was putting that out.' I said, 'Why, are they putting all the improvements on the place now?' and he said, 'Yes.' He also said: 'I have divided the land up among them, and made arrangement with them that, whatever improvements they put on there,

they shall put on at their own expense; that I am not going to put another dollar there, and that whatever they want they shall put there; and that the lands are divided among them, so that each one knows where his land is, and, whatever improvements he puts on, why he will have it.' He said: 'I am not going to put another dollar's improvement on there. All that I expect out of that land from now on is my little rent.' That is about the sum and substance of the conversation. He said at his death the lands were to go to these three boys, and whatever they put on the lands was to be theirs at his death. He said all he got out of it was a little rent during his lifetime."

W. B. Fowler, who was trying to close up the Sumner trade, testifies:

"His opposition was very decided, and he said to me, 'I cannot allow that east half of section seven to go into this trade, for the reason that I have given it to Jerry Harman."

Richard Foster, a farmer and trader, who knew Jacob Harman since 1866, testifies to a conversation with him as follows:

"He stated to me that the boys were working on those lands, and making improvements for which at that time he had not been paid, and really they were working for him in this arrangement. He said that they had arranged it differently now; that they were going on and improve the lands as was fit and proper, and they were to have the use of them, and pay him a certain sum annually for the use of the lands, and to pay interest on a sum of money; that eventually it would be all right; that he intended that the lands and money should be theirs. He stated that there was an agreement between them that they should work the lands, and pay certain rents and interest on a certain sum of money. He did not name what sum of money. Yes, he told me eventually that, if such rents and interest were paid, that the property would be theirs. That is pretty much the substance of the whole conversation, though he did a good deal of talking."

Frank M. Allen testifies:

"He [Jacob Harman] said the boys were improving that land and fixing it for homes, and he said this money that he loaned them he had charged ten per cent. interest on. I made the remark, 'Ain't that pretty good interest?' He told me they couldn't pay their interest and make the improvements alone. I don't know anything about the amount of business they were doing. Says he: 'I want to make them industrious and economical. I want them to pay the interest and fix the place up; and when I am dead it is all theirs, anyway. I intend them to have it.' Then he said they were paying him rent, besides interest for the farm. The boys on his land in Illinois were paying rent, besides interest. He said they were to have the place. That was all he said in regard to this land, or about any land in Illinois. He said there was an understanding between him and the boys that they should have that land."

John Vanderbilt testifies:

"He said he had land in Illinois, there, and three of his brother's boys were on it, improving it, and were to pay him rent for the use of it. He was telling me what he was going to do; that he was going to leave it to the boys out there; he was letting them improve it; and so on. At that time he said he was going to give the boys that land out there. They were going on, and pay him so much rent, and interest on the money loaned, as long as he lived. After his death it would be theirs. And he got to talking about his other lands. He said there was an agreement about that land between him and the boys."

Enoch P. Pierson, who lived in the neighborhood, and worked for Jacob Harman, testifies:

"I had a conversation with Jacob Harman, deceased, about these three boys. He said they were living on his land in Illinois; farming his lands and improving them. He told what they were to do. There seemed to be an agreement. I don't know just how he expressed himself, but they were improving lands, and it was to be theirs at his death. I mean the three boys. I think they

gave the particulars at the time, but, not being interested, I do not remember anything about it. He told me about going to the Illinois lands, and something about their paying him,—something about an account. I remember him speaking about it. I do not remember how long it was to continue. This conversation was in the latter part of 1882, at the home place, in Warren county. I was cutting a ditch on the west side of the place, on Kickapoo creek. * * * I asked him how the boys were getting along. He told me Bob was dissatisfied the first year he was there, and said that he had given him an interest in that land, as an inducement to get him to be satisfied. It seems to me that he said that Matt and Oscar had had control of these lands, and it was necessary that they should relinquish part of their claims, in order that Bob should be satisfied there, which they did. He had procured a parcel of the lands from the other boys for Bob, so he told me. I think he told me then where Robert's lands were, with reference to Matt's and Oscar's, but, not being interested in the matter, I didn't remember. * * * Uncle Jacob said: 'There is a weed growing here on the place, to be scattered over the ground. They could keep them down. I want them to do it, for they know it is theirs when I am done with it.' "

J. D. Stingley, a druggist and neighbor, testifies:

"I have heard Jacob Harman talk about his Iroquois lands, and his nephews living thereon. He was a great man to talk about his business, and he talked to me about it several different times in the last fifteen years, up to the time of his death. He told me the arrangement he had with the boys in Illinois, and spoke about it three or four different times. He was to give Matt so much land. It seems to me he would have a little more than the rest. It runs in my mind that he had 2,400 or 2,500 acres of land. Matt was to get a little more, and Oscar was to have the second largest, and Bob the smallest amount. As I understand it, Matt was to have the largest. He charged them so much a year rent."

Anthony Harman testified as follows:

"He stated to me, and it was my understanding, that they was to have the land to live on, but they had to pay him rent as long as he lived, but that rent was to terminate at his death. Then those lands were to be theirs."

And in reference to what Jacob Harman said about the effect of the last lease, and his brother's mental condition at the time, Anthony Harman testifies:

"What he said was that it wasn't to change relations at all; that he only wanted it. And I think he said that, inasmuch that he couldn't naturally expect to live long, that it was to terminate at the end of the year of his death. My idea was that it was to terminate, and that was the reason for the making of that provision. He said it was no different occasion; it was not to affect the title or our interest. That was the understanding among us all. If we had went into an argument, opposing him, at that time, I think he would have become an entire maniac. I do not doubt that we would have had to take him to the hospital, or something of that sort. I think he would have run entirely wild. During the last year of his life we never opposed him, because we were afraid of the result. We thought it would make him that much worse. The biggest craze he had, apparently, was in reference to surveying, and the corners of his land. He would imagine that somebody had moved certain corners. He would ask time and again if there had been a survey there, and who had made the survey, and if the corners had been removed; and there wasn't anything of the sort in existence, and none of us could say the corners were removed at all."

There is also evidence to show that Jacob Harman induced his brother Anthony to give his own land to his daughters upon the assurance that he (Jacob Harman) had already made provisions for Anthony's boys, and that they did not need it.

The only excuse which could warrant so full a statement of the testimony, mainly in the language of the several witnesses, to sup-

port the conclusions we have reached, is the peculiar nature and circumstances of the case. There is also other testimony, of a like character as the foregoing, going to show that the complainants went upon the lands in question, and put large and valuable improvements upon them, under an oral agreement and understanding that they were to pay an annual rent, to be secured by a lease, and 10 per cent. interest upon the $15,000 that Jacob M. Harman had borrowed and the $5,000 that Jeremiah R. Harman had borrowed, and for which they had given their notes to Jacob Harman during his life, and that upon his death the land was to belong to them. Indeed, as intimated by the court below, there is little or no conflict in the evidence upon this question, except that which exists between the oral agreement and some particular provisions contained in the leases, and especially in the last lease of October, 1884; and there can be no doubt that there are provisions in the last-named lease that are inconsistent with the general oral agreement, under which there is such an abundance of evidence to show that the complainants were induced to go into possession and make the improvements. And the question is whether it is competent for the court, upon any proper and reasonable basis, to reconcile these inconsistencies, or whether the leases only can be considered, as determining the true and only relation of the parties. The provision in the earlier leases which is relied upon to show inconsistency is the one which provides that the complainants shall cultivate, prune, and lay down the hedges, and charge Jacob Harman one dollar a day for the work; but considering the relation of the parties, from the whole evidence, it is not very difficult to account for this provision. Jacob Harman had been paying for improvements upon the land. Much of the land was low, and needed to be drained. It was almost worthless for purposes of renting until improvements were made. The evidence shows he had a great partiality for hedges. It was a sort of specialty with Jacob Harman. He wanted good hedges, and he wanted to help the boys, and he wanted the place in shape where they could afford to pay rent and a high rate of interest,—much more than the legal rate, or the complainants could afford to pay upon the large sums of money he had advanced to them. In one of the leases the payment of interest is provided for. There is no reason why it should be, as the notes provided for it, but the provision is put in the lease, showing the willingness of the uncle to put everything into writing which secured anything to him, or which inured in any way to his benefit, though he was equally willing that his nephews should rely upon his naked word for that part of the contract which made for their benefit; and the evidence shows beyond question that in general, and until the last year or years of his life, when he was in failing health and had come under adverse influences, he fully intended to carry out his agreement to give them the land. This he did by the execution of wills during the early years of their relationship, and latterly by making deeds of the land to them, to be delivered upon his death. The evidence is conclusive that in 1882 he executed deeds to the complainants of lands which they are now claiming, and caused them to be sealed up and delivered to Jacob M. Harman, whom he in-

tended then as one of his executors, to be opened and delivered, upon his death, to the proper parties. It is true that a little before his death he recalled these deeds, probably destroyed them, and made provision in his will by which the land they were to have by the deeds, as well as the improvements, for the most part, were taken from them and given to other parties; and it is now insisted that a court of equity is powerless to do justice in the premises, because of the strict rule of evidence that parol proofs cannot be admitted to change the effect of a written agreement. But if this rule was of universal application a court of equity could not relieve in case of fraud or mistake, and it could not receive evidence to show that a conveyance of land absolute upon its face was intended by the parties as security merely. The money secured might be only a hundredth part the value of the land, and yet equity will permit parol proof to show the intent of the parties that the conveyance is intended as a mortgage only. If a court of chancery, in so important a transaction, and in the peculiar circumstances of this case, is prevented by a rule of evidence from doing full justice upon the premises and all the facts of the case, and satisfying the conscience of the court, it might almost as well shut up its doors, and turn the parties over to their rights at law. The court below held in substance that all the talk and agreements between the parties, running through ten or a dozen years, were merged in the last extension of the lease, which never in fact took effect, because Jacob Harman met his death before the existing lease had expired, and consequently before there was any need of any extension. The provision in the lease of October, 1884, which is supposed to fix forever the relation and the rights of the parties, is as follows:

"Whereas, the above lease and article of agreement entered into by and between Jacob Harman of Warren County, State of Indiana, of the first part and J. M. and O. P. Harman of Iroquois County, State of Illinois, of the second part, commencing March the first, 1875, and extended to March the first, 1885, as evidenced by the above written article will expire March the first, 1885, Witnesseth, that it is hereby agreed by and between both parties that the same shall be extended on the same terms, and with all the provisions and restrictions therein contained, commencing March the first, 1885, and to continue from year to year on the following conditions, to wit: That the parties of the second part will quit and give up possession of said premises at the expiration of any one year in case the party of the first part shall sell or convey all or any part of said lands, or in the event that either party should die or become dissatisfied or in case of the party of the second part, failing to pay all or any part of the yearly rents or interest on or before the first day of November of any one year."

The court below held that the final relation of the parties was fixed by this extension of the lease, and that all the former talk and understanding between the parties, by which complainants were to have the land, was merged in this writing. This seems to the court rather a misapplication of the rule invoked, than being a result of the rule itself. If it be conceded that up to October, 1884, when this extension was signed, the complainants had been in possession under such an agreement as is claimed and the evidence points to, making permanent improvements on the faith of an unwritten contract, one expending fifteen thousand dollars and upwards in such improvements, and the other from eight to eleven thousand dollars; one

giving 14 years, and the other 10, of hard and intelligent labor, foregoing the obtaining of land for a home elsewhere for themselves and families on the faith of the unwritten word of this uncle, whom they trusted,—then it seems certain here was a parol contract, which had been substantially executed upon their part, by which they had earned and acquired an equitable title to the land, which gave them the substantial interest, and a right in equity to the legal title, and which was just as valuable and important to them as the legal title. And, if so, how does this extension of lease operate to cut off this equitable right? It must be either by conveyance in præsenti, or by way of estoppel. But the lease does not purport to be a conveyance of any interest in the land on the part of the complainants. It is simply, on its face, an extension of the former lease, with the same conditions, and with an entirely new provision added. The old lease would expire on March 1, 1885, then next ensuing. The new extension was not to take effect except upon the expiration of the lease already existing. Before that time came around, Jacob Harman died, so that as a lease the new extension never took effect. The complainants never in fact held the land under the new extension. Except as the seal imports a consideration, there was no adequate or substantial consideration for the relinquishment of their equity in the land, constituting a valuable property right, assuming that they had one, aside from what was given by the terms of the lease. Nor do we think the provision in question operates as an estoppel to prevent the complainants from showing the truth of the entire transaction. It would be severe and unjust, and against equity, that it should so operate. It cannot be considered an estoppel by deed, because the suit is not founded upon the lease, which comes in question only in a collateral way. The lease never took effect, and the complainants never held under it. Bigelow, Estop. (4th Ed.) 341. There is no estoppel in pais. No person has been induced to change his condition to his prejudice on account of the lease. There was no adequate consideration for it in fact, and in the judgment of the court the provision in question is to be taken and considered simply as a written admission by complainants against their own interests, and as such, like any other admission, is subject to explanation. 1 Phil. Ev. (Cow. & H. 5th Ed.) § 418, note 122; Id. § 453, note 129; 1 Greenl. Ev. § 173. This, in the opinion of the court, is the highest and only office this provision can serve, as an admission by complainants, under seal, that their relation to Jacob Harman was only that of tenant to their landlord, and nothing more. In this view, the evidence which it furnishes is to be considered with the explanations given, and in connection with all the other competent evidence in the case. Considered in that light, we cannot doubt that, taking the evidence as a whole, the written and unwritten together, it shows that the complainants held the land under a contract by which they were to go on and make improvements and pay rent during the life of Jacob Harman, and at his death the land was to be theirs; that only a portion of this contract was ever reduced to writing, to wit, that which was to secure to Jacob Harman the rent; that under this agreement, resting partly in writing and partly in parol, the com-

plainants went on and occupied the land for a series of years, making permanent and valuable improvements, with full knowledge and consent of Jacob Harman, for which they hired money of him, and fully performed the contract on their part, so that, so far as they were concerned, it was an executed agreement, entitling them to a specific performance. The complainants from 1875 treated the land as their own, in every way. They planted and tended hedges, laid miles of tile and built miles of fences, set out groves of fruit and shade trees, built houses, barns, cribs, sheds, and outhouses, expending large sums of money for these purposes. The facts bring the case fully within the rule for specific performance. Not to grant relief in such a case would be only to encourage fraud, which the statute of frauds, requiring a contract for the sale of land to be in writing, was passed to prevent. The rule, as laid down by Story, is as follows:

"In the next place, courts of equity will enforce a specific performance of a contract within the statute, where the parol agreement has been partly carried into execution. The distinct ground upon which courts of equity interfere in cases of this sort is that otherwise one party would be able to practice a fraud upon the other, and it could never be the intention of the statute to enable any party to commit such a fraud with impunity. Indeed, fraud in all cases constitutes an answer to the most solemn acts and conveyances, and the objects of the statute are promoted, instead of being obstructed, by such a jurisdiction for discovery and relief. And where one party has executed his part of the agreement, in the confidence that the other party would do the same, it is obvious that, if the latter should refuse, it would be a fraud upon the former to suffer this refusal to work to his prejudice." Story, Eq. Jur. § 759.

The last expression of the same rule by the United States supreme court will be found in the very recent case of Riggles v. Erney, 154 U. S. 244, 14 Sup. Ct. 1083, where the court, after citing many of its own decisions, say:

"Indeed, the rule is too well settled to require further citation of authorities, that if the parol agreement be clearly and satisfactorily proven, and the plaintiff, relying upon such agreement and the promise of the defendant to perform his part, has done acts in part performance of such agreement, to the knowledge of the defendant,—acts which have so altered the relations of the parties as to prevent their restoration to their former condition,—it would be a virtual fraud to allow the defendant to interpose the statute as a defense, and thus to secure to himself the benefit of what has been done in part performance. It must appear, however, that the acts done by the plaintiff were done in pursuance of the contract, and for the purpose of carrying it into execution, and with the consent or knowledge of the other party. While acts done prior to the contract, or preparatory thereto, such as delivering abstracts of title, measuring the land, drawing up deeds, etc., are not regarded as sufficient part performance, it is otherwise with such acts as taking open possession of the land sold, or making permanent or valuable improvements thereon, or doing other acts in relation to the land manifestly inconsistent with any other theory than that of carrying out the parol undertaking."

The decisions of the supreme court of Illinois, where the land was situated, are equally decisive of the rule. Bright v. Bright, 41 Ill. 97; Kurtz v. Hibner, 55 Ill. 514; McDowell v. Lucas, 97 Ill. 489; Langston v. Bates, 84 Ill. 524; Bohanan v. Bohanan, 96 Ill. 591; Smith v. Yocum, 110 Ill. 142; Irwin v. Dyke, 114 Ill. 302, 1 N. E. 913; Morrison v. Herrick, 130 Ill. 631, 22 N. E. 537.

In many of these cases, which are full and decisive, and which we have examined with care, there were family relations, as in this

case, where there is always a temptation to have the contract unwritten, trusting to the confidence of father, uncle, or other relations. In the circumstances of this case, we are of opinion that the explanation given of the reason for signing the extension of October, 1884, about which there is no dispute or conflict in the testimony, is reasonable, and that its allowance by the court does better justice than to hold the complainants to the strict letter of the recitals, against the great weight of evidence. The evidence of the witnesses is all to the same effect. Jacob Harman was a man of imperious will, and accustomed to have his own way. He was occupying towards his nephews the relation of a parent and benefactor. He always wished and generally required them to do as he wanted them to do in regard to the land. When one of them wished to buy other land to add to his farm, Jacob Harman told him: "No; you have land enough already. Improve what you have,"—and the nephew submitted. When the nephews wished to borrow money, which they could do at 7 per cent., and pay off their large indebtedness to their uncle, on which they had been paying 10 per cent. interest, Jacob Harman said: "No; you are to pay me ten per cent. as long as I live; and you can afford to do it, as then both the land and the money will be yours, and I want this interest for my peculiar purposes,"—and the boys submitted to their uncle's will, and paid 10 per cent. until his death, many years after the money was worth but 7 per cent.; and so in many other ways he controlled and dictated their actions, they nevertheless having confidence in him, that he would do as he agreed in regard to the land. In July, previous to the making of the last lease, Jacob Harman had a fall, which confined him some time to the house. From this time his health began to fail rapidly, he became fitful and suspicious, and grew into that condition of mind that some of the witnesses thought bordered on insanity. In these circumstances, these extensions of the leases, which still had five months to run, were drawn up by the uncle's man of business, and laid before them to sign, and containing these recitals so at variance with the contract which had subsisted for years between them. They declined to sign, saying it was not according to their contract and understanding. Jacob Harman said: "Sign, for it will make no difference. I intend you shall have the land just the same." His brother Jacob M. Harman, of Benton county, uncle of the complainants, said, "Sign, for it will make no difference." Their father, Anthony Harman, said: "Sign, for your uncle's life is precarious, and a refusal to sign may endanger it. Your sister refused to sign a receipt for money which she never had, and your uncle will not let her come near the house. If you refuse to sign, you may turn his affections away from you." After some hesitation they sign, and afterwards Jacob Harman told his friends and neighbors that their signing was to make no difference with their interest in the land, which they were to have according to the understanding between them. The ultimate question is not what was admitted by the complainants, but what was the truth.

But the complainants' case, so far as they seek relief against the judgments at law upon the notes given for borrowed money and for

stock, stands upon a different footing. The suit, as regards the prayer for an injunction, is against the executors, and the complainants' evidence cannot be received. But, aside from this, the claim stands upon a different footing in equity. These notes were given upon full and adequate consideration, and were valid obligations in law; and, while there is evidence to show that Jacob Harman intended to give them the principal at his death, he did not do it, and in not doing it they have not much to complain of, in equity and good conscience. The proceeds of the notes, for the most part, went into improvements on these farms, and it is on this ground that a specific performance of the contract for a conveyance of the land is asked. But it would not be equity to give them the land on this ground, and at the same time the money with which the improvements were made. There can be no doubt from the testimony that the complainants paid 10 per cent. interest on this $20,000, on the uncle's promise that it would be theirs at his death. But in paying that large interest they were doing no more than they had contracted to do in the notes, and they had a right to pay them up whenever they became due. There seems to be no adequate consideration or sufficient equity for giving them this large sum of money and the land as well. The decrees of the court below should be reversed and the cases remanded, with instructions to enter decrees as prayed for in favor of complainants, for a specific performance of the agreement for the conveyance of the land severally claimed by the complainants in their bills of complaint, but denying the relief prayed for by injunction against the collection of the judgments at law.

JENKINS, Circuit Judge (dissenting). There can be no doubt that in a proper case a court of equity will give effect to a parol undertaking for the conveyance of land; but, to sanction its recognition, the parol agreement must be clearly and satisfactorily proven, and it must appear with like certainty that the acts of part performance were, to the knowledge and with the consent of the other party, done in pursuance of and in execution of the parol agreement. If such acts of part performance may properly be referred to written contracts existing between the parties, they cannot be deemed to be done in execution of the parol agreement. They must be, to use the language of Mr. Justice Brown, "manifestly inconsistent with any other theory than that of carrying out the parol undertaking." Riggles v. Erney, 154 U. S. 244, 251, 14 Sup. Ct. 1083. The act of part performance must be unequivocal.

Lord O'Hagan, in Maddison v. Alderson, L. R. 8 App. Cas. 467, 485, said:

"It must have relation to the one agreement relied upon, and to no other. It must be such, in Lord Hardwicke's words, 'as could be done with no other view or design than to perform that agreement.' It must be sufficient of itself, and without any other information or evidence, to satisfy the court, from the circumstances it has created and the relations it has formed, that they are only consistent with the assumption of the existence of a contract, the terms of which equity requires, if possible, to be ascertained and enforced."

The considerations by which courts of equity should be guided with respect to the enforcement of such parol agreements are stated in

Purcell v. Miner, 4 Wall. 513, and approved in Williams v. Morris, 95 U. S. 444, 456. The court observes:

"That the proof as to the terms of the contract must be clear, definite, and conclusive, and must show a contract, leaving no jus deliverandi or locus penitentiæ; that it cannot be made out by mere hearsay or evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, which the witnesses have no reason to recollect from interest in the subject-matter, and which may have been imperfectly heard or inaccurately remembered, perverted, or altogether fabricated; that the proof must show that the consideration has been paid or tendered, or that there has been such part performance of the contract that its rescission would be a fraud on the other party, which could not be compensated by the recovery of damages, or that the delivery of possession has been made in pursuance of the contract, and has been acquiesced in by the other party."

The court observes in the latter case that:

"To take the case out of the statute upon the ground of part performance, the party making the attempt must show by clear and satisfactory proof the existence of the contract as laid in his pleading, and the act of part performance must be of the identical contract which he has in that manner set up and alleged. It is not enough that the act of part performance is evidence of some agreement, but it must be unequivocal and satisfactory evidence of the particular agreement charged in the bill or answer. Specific performance in such case will not be decreed unless the terms of the contract are clearly proved or admitted; and a sufficient part performance is made out to show that fraud and injustice would be done if the contract was held to be inoperative; and all the authorities agree that the acts of part performance must be such as are referable to the contract as alleged, and consistent with it."

A general discussion of the testimony would serve no useful purpose within the scope and for the object of a dissenting opinion. I think it proper, however, to indulge in a review of the testimony so far as necessary to fortify the opinion, which I cannot but entertain, that the court has indulged a wide departure from principle.

Jacob Harman was a peculiar man. He settled in Warren county, Ind., in the early days of that state. He was a thrifty man. By labor, economy, and abstemious habits of life, he had acquired considerable possessions of land in that county and in the adjoining county of Iroquois, Ill., at the low prices at which real estate was obtainable in those early days. The development of those states largely increased the value of his possessions. He seems to have been a man peculiarly careful and exact with reference to his engagements. The testimony, as I read it, discloses him to be a man who at all times and under all circumstances pertinaciously insisted that all contracts with him should be reduced to writing. He seems to have had, what all courts dealing with human testimony will recognize as justifiable, a well-grounded distrust of the reliability of human memory. Whether that distrust was grounded as well upon want of confidence in human integrity I cannot say, but the fact is established as I have stated it. He also bore the reputation of a thoroughly honest man, carrying out with the utmost fidelity the contracts into which he entered, and exacting like performance from those with whom he had engaged. He seems to have been a just man, and withal kind hearted and benevolent. With him some act of inconspicuous charity seems to have been a daily duty,—not giving with lavish hand merely in aid of present need, but bestowing

his bounty in the way of aid to those who were willing to help themselves, and who should approve themselves deserving of assistance. He was opposed, doubtless upon principle, to that gratuitous giving which injures the recipient, teaching him to rely upon his benefactor rather than upon his own exertions. He seems to have taken interest in the cause of education, entertaining the proper notion that training and learning are better gifts than mere pecuniary bounty, which often proves hurtful rather than beneficial. He was a man without family, never having married, and, at the commencement of the transactions involved, had attained the age of 70 years. He had five brothers, each of whom had families, and none of whom appear to have been in prosperous circumstances. His brother Anthony Harman resided in Missouri, and had met with financial reverses, through which he was likely to lose his home. Jacob Harman became possessed with the idea of aiding the sons of this brother; but, as I read the case, he went about it in the same careful, methodical way that he would undertake any other business relating to his property. It would have been foreign to his nature and wholly irreconcilable with his habits of thought and of action, that he should turn over to his nephews, without restriction or limitation, the property which he had acquired by the labor of a lifetime. He chose another, and, as I think, a better, way to aid them. He purposed to place the young men just attaining their majority in a position where, if they were so disposed, they could make men of themselves, earn honest livings, and acquire frugal and business habits, fitting them to sustain themselves and their families in the struggle for existence. It will not be necessary to refer particularly to the two causes. One is much the counterpart of the other. Therefore, in the observations which I deem it proper to make, I shall confine myself to the case of Jacob M. Harman.

What, then, was the contract—the parol undertaking—which the court is asked to enforce? The parol agreement stated in this bill was this: That in 1867 it was arranged that the appellant should move upon the lands of Jacob Harman, in Iroquois county; that they should be cultivated and improved by the appellant and his brother Oscar during the life of their uncle, they paying to him an annual rental, to be fixed by lease, "and that, at his decease, the said Oscar P. Harman should have in fee for his own the lands which he cultivated and improved, and your orator should have in fee the lands which he should cultivate and improve;" that in 1871 he moved upon and occupied, with his brother, some 720 acres, they agreeing to pay their uncle as rental one-quarter of the net proceeds of the land, the uncle selling them stock and farm property. A lease was executed for the term of two years, and occupancy was held without further lease until 1875. At this time it was agreed, so the bill alleges, that the appellant and his brother Oscar should settle among themselves which of the lands each desired, the agreement then to embrace some 2,440 acres of land, and each should occupy them in severalty thereafter, and they would jointly engage to pay to Jacob Harman a fixed sum for rental during his life. The specific lands are stated in the bill, which then proceeds: "And he then assured

your orator and his said brother that he would fix the lands in his will so that each one should have the fee of the lands allotted to him." And Jacob Harman then executed a lease for the term of two years to the appellant and his brother Oscar of all the lands occupied by them, by which was reserved an annual rental of $2,200 for the use of some 2,440 acres. The evidence establishes that, during all the period they held possession of the land, the annual rental value was from $2 to $2.50 per acre, they yielding only some 90 cents per acre. The bill further alleges that, substantially contemporaneously with that parol agreement, there was a further parol agreement to the effect that, whereas Jacob Harman had advanced to the appellant and his brother $15,000 in property and money, they should execute their notes to him for the amount, payable in one year, with interest, and that the note was given and received with the agreement and understanding that the interest should be paid during the lifetime of Jacob, and that the principal should never be paid.

It is to be observed that the agreements alleged rest upon the evidence of the appellant, speaking to a transaction with his uncle Jacob, whose lips are sealed in death, and whose voice can no longer be heard in contradiction of any statement this interested party may make. I agree that, under the statute of the United States, this evidence must be considered; the statute only excluding evidence of an interested party in actions by or against executors, administrators, or guardians. In the states with whose legislation I am familiar, and in those to which I have been able to refer, the law has carefully guarded the admission of the testimony of one touching transactions with a deceased person where that one claims property through such transaction. Such evidence is excluded when the party tendering such evidence derives his title from, through, or under such deceased person. Under such legislation the appellant could not be heard. Under the statute of the United States his testimony would be incompetent as against the executors or administrators of the deceased, but can be received as against devisees under the will of the property in question. I cannot but think that in the drafting of this statute there was inadvertent omission. I cannot believe that the lawmaking power, excluding parties from testifying to transactions with deceased persons as against executors or administrators, would designedly permit the like testimony as against devisees under the will of the deceased. The purpose of the statute is plain, that, where one party to a transaction is dead, the other shall not be heard with respect to personal transactions with him. The reason of the exclusion is as potential in the case of devisees as in the case of executors or administrators. The purpose is to defend the estate from alleged verbal transactions with the deceased, asserted by one interested, when there can be no one to gainsay his statements. The admission of such evidence shocks the moral sense. The weakest conception of justice revolts at the suggestion. It would be altogether too easy for interested and designing parties, out of alleged conversation with a deceased person, to establish claims to his property. It would be a safe thing to do, for they are assured in advance that no voice can be raised to dispute the claim. "Dead

men tell no tales." Distorted and perjured testimony is safe in the presence of death. Until the statute, the law has never tolerated such an enormity. Formerly parties could not testify in their own behalf, and any interest in the event was considered a disqualification. Of recent years the disqualification from interest has been removed, perhaps wisely, although some might think that the almost invariable contradiction in the testimony of parties to the record, daily evidenced in the courts, would sanction the opinion that private virtue and public morals would more certainly be promoted by restricting than by extending this innovation upon the common law. However that may be, in permitting the evidence of parties to the record, the various legislatures speaking to the question, with the exception of congress by this, as I think, inadvertent omission in the federal statute, have been careful to prohibit any party from testifying to any transaction had personally with a deceased person in any action in which he seeks to assert or defend title derived through such deceased person. I am aware that the supreme court, in the case of Goodwin v. Fox, 129 U. S. 601, 9 Sup. Ct. 367, felt bound by the terms of the statute, and has ruled that such evidence is competent. But it, nevertheless, remains true that the courts are not bound to give the same credence to such evidence as if it were delivered by one indifferent to the result of the litigation. Nor should such evidence stand upon equal ground with the testimony of the party who can be confronted with the one whose declarations are asserted. We have a right in weighing testimony to consider the great interest that the witness has at stake; and we have a right also, and it is our duty, in such a case as this, to consider that he speaks knowing that no human power can summon from the grave the one who might contradict him or dispute his statements. Therefore, I think that a court of equity should not only apply to the testimony of the appellant the general rule that the evidence of the undertaking should be clear and satisfactory, but should also insist that such evidence should in all essential particulars stand uncontradicted, and should be fully corroborated.

I desire to state here, as briefly as I may, some of the facts and circumstances which, in my opinion, contradict the evidence of the appellant, and render his statements wholly inconsistent with his own acts.

When the appellant and his brother first entered into possession of the lands in question, it is conceded that a lease was executed by Jacob Harman to them. That lease is not produced, but it is stated that it was a lease for two years, the rental being one-fourth of the crops produced. The appellant and his brother remained in possession until about March 1, 1875, the date of the final alleged parol undertaking which we are asked to enforce. If the lease then executed was in pursuance of the parol undertaking set up in the bill, one would naturally look for a lease to continue during the lifetime of Jacob Harman. It was, however, a lease for but two years, and it contains a clause that is utterly and wholly irreconcilable with the alleged parol undertaking. It provides that the appellant and his brother shall replant at the proper time, cultivate, lay down, and

prune, as directed by Jacob Harman, certain hedges, and do all the plowing necessary in replanting and cultivating other hedges, and that Jacob Harman shall pay to the appellant and his brother one dollar per day for their labor in so doing. I cannot comprehend by what mental legerdemain that agreement can be reconciled with an agreement by which the appellant and his brother were to own the land, simply yielding to their uncle during his lifetime a stipulated rental. The appellant is as silent as the Sphinx in explanation of this patent and irreconcilable contradiction of his evidence. The court would explain it and reconcile it upon the ground that Jacob Harman had a "partiality for hedges," and that it was a specialty with him. Jacob Harman may have had a conceit for hedges, but he was not the man to gratify his fancy by spending money in the cultivation of hedges upon other people's lands. The court seeks also to explain the patent inconsistency by stating that "he wanted to help the boys." So he did. It is a little remarkable, however, that, advancing $15,000 in money and stock, he should insist upon taking their note and receiving interest for the loan, while at the same time he should pay them money for improving their own land. The reasoning of the court in reconciliation of manifest contradiction is to my thinking far from convincing.

In October, 1876, this lease was by writing extended to March 1, 1878, and in the written extension the appellant and his brother agree to replant, plow, and hoe all the hedgerows, and to prune and lay down all the hedge as it may be needed, all to be done in good order, free from any additional charge. It would seem that Jacob Harman's "partiality for hedges," and his desire to "help the boys," to be gratified by paying for their labor upon their own property, only continued for a period of two years. Thereafter he gratified his "partiality for hedges" at their expense. In March, 1878, by written agreement, the lease was further extended until March 1, 1882. This writing contains a like provision in respect of hedges and repair of fences, to be done by the appellant and his brother "free from any extra charge." On the 31st of January, 1882, by agreement in writing, the lease was further extended until March 1, 1885, with like provision as to hedges and fences and buildings, "all to be done without any additional charge, and Jacob Harman reserves the privilege to build a schoolhouse on the north side of section 13." Are these provisions consistent with the ownership of this land by the appellant and his brother, subject only to an annual rental to their uncle? They do consist with the ownership of the land by the uncle. They conflict and are irreconcilable with any notion of ownership in the nephews. In reconciliation of these latter provisions of the written agreements with the alleged parol undertaking, the opinion of the court and the testimony are alike silent. It may be remarked that, in the case of Jeremiah R. Harman, the lease executed for two years from March 1, 1882, contains a provision that, if either party should die before the expiration of the time, "then the lease to close with the year of such death." On the 24th of October, 1884, the parties executed another agreement in writing, by which the lease was extended, on the same terms, for a further term,

commencing March 1, 1885, and to continue from year to year, on the condition that the appellant and his brother "will quit and give up possession of said premises at the expiration of any one year in case the party of the first part [Jacob Harman] should sell or convey all or any part of said lands, or in the event that either party should die or become dissatisfied, or in case of the party of the second part [the appellant and his brother] failing to pay all or any part of the yearly rents or interest on or before the first day of November of any one year." The written agreement contained a further condition for the keeping "in good repair the houses and other buildings, also fences, hedges, drains, etc., without any further charges for the same." What shall be said in reconciliation of this agreement with the alleged parol undertaking? Its execution is admitted, but the interested parties say that, in their judgment, their uncle Jacob Harman was nearly or quite insane at the time. Jacob Harman was then upon his bed of sickness, which not long after proved to be his bed of death. It is said the agreement never became operative, because the uncle died before the 1st day of March, 1885. It is said that the parties signed this paper because their uncle was fretful and suspicious, and was in a condition of mind bordering on insanity, and that their uncle told them: "Sign, for it will make no difference; I intend you shall have the land just the same." The appellant states that he signed it for fear his uncle might do something that would be "detrimental to our interests." For these reasons the court ignores this document, and holds the appellant not concluded thereby, and that, even as an admission, it is not sufficient to overcome his oral testimony.

With respect to the alleged insanity of Jacob Harman, it may be said that, if he was insane, the appellant and his brother certainly were not insane, and a contract with an insane person in the state of Illinois, where this land is situated, is voidable only, not void,— voidable by the insane, not by the sane, party thereto. McCormick v. Littler, 85 Ill. 62; Scanlan v. Cobb, Id. 296; Burnham v. Kidwell, 113 Ill. 425. It is like to a contract with an infant,—voidable by him, but binding upon the other party.

A word with respect to the excuse offered for the execution of this instrument. If these nephews had a contract by which they were entitled to the land absolutely upon the death of their uncle, how could he by any act deprive them of any of their rights, whether he was sane or insane? There is, however, no evidence of his insanity. It is true that he was upward of 80 years of age. He was afflicted with the bodily infirmities of age. He may have been peevish and fretful, irritable and exacting. Is that ground for refusing to recognize the deliberate engagements or admissions of parties? He appears to have been mentally unaffected by the diseases of his body so far as respects the careful consideration of his business interests, and the recognition of his duty to those dependent upon his bounty, and to those benevolent objects which had engaged his interest. His will, executed on the 4th day of February, 1885, is before us. It contains 20 clauses with respect to the disposition of his

estate. Each clause is expressed with a particularity of detail that could only emanate from a sane and disposing mind, and the whole instrument evidences deliberate conclusion with respect to the distribution of an estate by one who had carefully considered his duty. The instrument is, to my thinking, a photograph of the man, as I read his mental characteristics in the evidence in this record. He gives to his brother Anthony and to his nephew John, the son of Anthony, as joint tenants for life, with right of survivorship, a life estate in 609 acres of land in Warren county, and vests the fee upon their death in the sons of John then living. He gives to his nephew Waldo, another son of his brother Anthony, for life, 740 acres in Warren county, with remainder in fee to his sons. He gives to the appellant, another son of his brother Anthony, a life estate in 600 acres in Iroquois county, part of the lands in controversy, with remainder in fee to his sons; and to Oscar P., another son of his brother Anthony, for life, 560 acres, part of the lands in controversy, with remainder in fee to his sons. He gives to Jeremiah R. Harman, another of the appellants, and a son of his brother Anthony, 440 acres, part of the lands in controversy, for life, with remainder in fee to his sons. He gives to the three sons of his brother David a life estate in 709 acres of the land in Iroquois county, for life, with remainder in fee to their sons. He gives to the trustees of Wabash College 640 acres of the land in controversy in trust, the rentals to be used to found a perpetual scholarship for the use of the Harman families, so that some one member of the families of his five brothers shall have free tuition thereat during all time. He imposes upon the lands devised to his nephews an annuity in perpetuity of 25 cents an acre, to be paid to the American Bible Society for the purposes of that institution. He makes careful provision for the payment of taxes upon the lands by the tenants for life. He bequeaths to his nephews residing in Warren county and in Iroquois county, including the appellants in these causes, $1,000 each, which shall be deducted from any sum each such legatee may owe the estate. He directs that his executors take no account of his household goods and his horse, but they shall inventory and appraise the leases held by him against his five nephews, including the appellants here. This will, which was duly probated without contest by these appellants, is stronger evidence of the sanity and the disposing power of mind of Jacob Harman than the unreliable and not disinterested statements of these nephews, offered in tame excuse for their signatures to a document which is in absolute contradiction of the alleged parol undertaking. I care not whether the court treats it as a contract or as an admission. It was at least their solemn statement in writing, under seal, at a time when they had no interest to distort the truth. The writing is in entire accord with every written instrument they signed. It is in accord with every act of the appellant touching the land. It is far more reliable evidence than the present statement of a parol agreement that I think is in conflict with every act done and every paper signed. It ought to prevail over the testimony of an interested party whom death has relieved from the possibility of

contradiction by the one out of whose mouth is sought to be established this parol undertaking.

But that is not all. There are other paper writings equally inconsistent with the alleged parol undertaking. In 1876, the year following the making of the alleged parol agreement, the appellant and his brother executed an instrument which acknowledges the receipt from their uncle of the sum of $400, in payment of all demands "on account of buildings, hedge planting, and cultivation, laying down and pruning, making ditches, tile draining, or any other improvements, of whatever kind or nature, on the lands belonging to said Jacob Harman, now occupied by us in Iroquois county and state of Illinois." In this instrument they further agree to keep in repair the fences, buildings, and hedges so long as they may occupy the lands, and to make no further charges against their uncle or his estate after his death for any buildings or fences they may put on the land, and to offer no claim on account of such improvement as an offset against rents or interest upon the promissory note of $15,000. If this parol agreement existed, how is it possible that, within one year after it was made, we find the appellant receiving and the uncle paying for improvements upon lands in which the uncle was not interested, except with respect to the receipt of a rental previously stipulated? Why is it that we find the alleged equitable owner of the land covenanting, with one who had merely the right to a stipulated rental, that the fences, buildings, and hedges should be kept in repair? Such a stipulation is ordinarily made by tenants. It is a covenant usually made with respect to another's property, not with respect to one's own property. It is a stipulation in antagonism to and wholly irreconcilable with the alleged parol undertaking. On the 1st of March, 1878, there is another agreement signed by all the parties, and confessedly in the handwriting of the appellant. It recites that it is executed in connection with the extension of that date of the lease. The appellant thereby agrees to fence a certain field, and to put thereon not less than 150 rods of tile, sufficient to drain the field, and to cultivate a hedge around the field, and to plant and cultivate a grove upon the land; all to be done at his own expense, without further charge, for which, the agreement recites, "Jacob Harman has this day paid unto the said Jacob M. Harman the sum of $1,500." There is the further provision that the appellant may fence a certain other field, and cultivate the same by hedging and tiling that part which he may fence and cultivate, as said Jacob Harman may direct. There is the further stipulation that the agreement is in no way to interfere with the amounts to be paid as specified for rents in the original lease. This is accompanied by the bond of the appellant to his uncle for the faithful performance of the work in the contract specified. There is attached to this agreement a receipt dated March 3, 1879, executed by the appellant, acknowledging the receipt from his uncle of the $1,500 specified in the agreement. In June, 1879, another document was executed by the appellant, which acknowledges the receipt from his uncle of $250, in full payment of all demands against his uncle, "including everything due me on account of fences built, ditches and

drains made, hedges planted, cultivated, or pruned on the land owned by the said Jacob Harman in Iroquois county, in the state of Illinois." And, in consideration of such payment, the appellant agrees to properly cultivate and keep in order the hedge and fences, and to make no charge against his uncle, or his estate after his death, for any improvements which he has heretofore put "upon the lands of the said Jacob Harman in said Iroquois county, state of Illinois, or offer any claim on account of such improvements as an offset against rents or interest due said Jacob Harman, his heirs, executors, administrators, or legatees, from me, so long as I shall remain in possession of said lands, when such improvements or work may be done." He further acknowledges "the full settlement by the said Jacob Harman of all sums paid by me for him on the taxes upon his land in Iroquois county, state of Illinois, by an allowance of said taxes upon the rent due said Jacob Harman for (from) me for a portion of said lands."

I need not stop to comment upon the lame and halting excuse which the appellant offers for the execution of these papers. He states that he never received either of the sums mentioned, and that his uncle "wanted us to sign the receipt to prevent the heirs of Jacob M. and Oscar, in case of our death before their heirs, from making any claim for these improvements." If that parol undertaking existed, there could be no claim for such improvements, and the parties knew it. The appellant would have us believe that his uncle, his brother, and himself, during all these years, by these written documents, were living a lie; and to no purpose. I cannot bend my judgment to sweep away these deliberate written documents upon any such paltry excuse, if the law permitted me to exercise the discretion to do so. These documents are under seal containing covenants. They are not mere receipts. They are not open to be disputed or controlled by parol evidence. The Cayuga, 16 U. S. App. 577, 8 C. C. A. 188, and 59 Fed. 483.

There is further introduced in evidence receipts executed by the appellant and his brother in the years 1878, 1880, 1881, 1883, and 1884, acknowledging the receipt from their uncle of over $4,000 to pay taxes on personal property upon the lands, and taxes upon the lands themselves, in which these lands are referred to as the real estate of Jacob Harman. The rental of the property was fixed and determined. It was subject to no abatement. If the land belonged to the nephews, and they were to occupy it, improve it, and have it for their own, yielding during the life of the uncle less than one-half its rental value, how is it that we find the uncle paying taxes year after year upon the real estate which they would have the court believe belonged to them, and not to the uncle? Jacob Harman died in the early part of the year 1885. His will was duly probated, without opposition from the appellants. His will made some changes as between the nephews in respect to the lands previously occupied by them. After the death of the uncle, they exchanged their possessions to conform to the provisions of the will, thus recognizing the right of their uncle to make such disposition of these lands as he thought fit. This is a circumstance not without weight, tending to show that the alleged parol agreement was an afterthought. It was not until 1892, after the

executors in the administration of their duty had obtained a judgment against the appellants upon the note to their uncle of $15,000, which they carried by writ of error to the supreme court of the United States, where the judgment was affirmed (Harmon v. Adams, 120 U. S. 363, 7 Sup. Ct. 553), and not until the filing of the bill in this cause, that this parol agreement is asserted. During these seven years following the death of the uncle, we find acquiescence in the provisions of the will, and recognition of ownership and right of disposition by him over the lands in question.

I do not care to follow the court at any length in its review of what is called the corroborating evidence of neighbors of Jacob Harman, attempting to detail chance expressions of his, during a period of many years, concerning the lands in question. These parties, possibly at the suggestion of interested persons, recall loose bits of conversation at different times had with Jacob Harman. They had no interest and no reason to accurately remember what was said, and they are called up in memory, certainly some 10 years or more after they were said, under such circumstances that I can put but little reliance upon the accuracy of memory. It would be unsafe to do so.

It was well observed by the supreme court of Pennsylvania in Rankin v. Simpson, 19 Pa. St. 471:

"If a party calls on courts to execute parol contracts for lands in spite of the statute of frauds and perjuries, let him prove a contract. Because he can find persons who remember the owner's loose or casual declarations of a sale, shall he have a decree in disregard of the statute, and in opposition to his own declared convictions? The chancellor has never lived who would tolerate such a demand. Patents and deeds and wills would be a solemn mockery if they might be trifled with and set aside in this manner."

A careful review of these declarations will, in my judgment, show nothing inconsistent with the ownership of this land by Jacob Harman, and will show nothing corroborative of the alleged parol undertaking. There was nothing said, as I view the testimony, that is at all inconsistent with the uncle's absolute ownership of the land. The testimony does, indeed, show many expressions of his intention that his nephews should have the land at his death, which, if reliable, would lead to the belief that Jacob Harman did entertain the intention, his nephews proving worthy, to give them the whole or a large part of these 2,400 acres of land; but the testimony falls far short, in my judgment, even if implicit credence be given to it, of showing a present binding contract. Thus, one witness, Mr. Foster, states that Jacob Harman said he intended that the land and moneys should be theirs,—"I intend them to have it." Such declarations, when made to the intended beneficiaries, doubtless raise natural expectations, and may possibly induce action upon faith in the declarations, but they serve only to announce present revocable intention, not a binding contract. The testimony of Mr. Davis, upon which great stress is laid by the court, is to the effect that, in 1882, Jacob Harman executed deeds which contained the description of the lands sought to be charged by this alleged parol undertaking. He also executed deeds in 1880 and in 1881. This fact alone indicates a certain intention to give to his nephews at his death certain of these lands, but also indicates a change of intention from year to year with respect to the

particular lands which he would give to each. These deeds were never delivered, and were never intended to be delivered until his death. He designed and carefully provided to that end, and they were destroyed by him in his lifetime. Such evidence does not prove or tend to prove an absolute irrevocable parol undertaking to convey these lands. The entire testimony discloses that the purpose of the uncle with respect to his nephews rested in intention, not in contract.

It may be remarked as passing strange that the court should have considered and in part relied upon the testimony of the attorney of Jacob Harman as confirming this alleged parol agreement. The evidence referred to, like all the evidence detailing conversation, is far from conclusive, is full of uncertainties, and does not correspond to the established facts of the case. I refer to it, however, to remark astonishment that the court should have considered it at all. The witness was the attorney for Jacob Harman, and testified to communications made to him in that relation. He obtained the information in his professional capacity. His duty required him to refuse to disclose the communications of his client; and, if he was so far forgetful of his duty that he was willing to disclose, the law will not permit such disclosure without the consent of the client. The law requires that, with respect to statements by client to counsel, the lips of the latter shall be forever sealed, unless opened by the client, and this does not cease by the sundering of the ties between attorney and client, nor upon the death of the client. The inhibition of the law is enduring, prohibiting at any time and under all circumstances the disclosure of the confidential communications of the client.

I need not further pursue this branch of the case. The alleged parol agreement is not made out by clear and satisfactory evidence, and is in the face of and in direct contradiction of every written document signed by the parties now asserting ownership of the land.

The following cases may profitably be referred to in this connection as forceful to deny the relief sought: Semmes v. Worthington, 38 Md. 298; Shellhammer v. Ashbaugh, 83 Pa. St. 24; Gerry v. Howe, 130 Mass. 350; Chalker v. Chalker, 5 Redf. Sur. 480; Hoar v. Hoar, Id. 637; Ellis v. Cary, 74 Wis. 176, 42 N. W. 252; Alderson v. Maddison, 7 Q. B. Div. 174, affirmed on appeal L. R. 8 App. Cas. 467. The last case is quite instructive. The defendant there had been for some years housekeeper of Mr. Alderson. She entered his service in 1845, when 16 years of age; remained until 1860, and, her wages being then considerably in arrears, she determined to quit his employment; but he, being an old man, and anxious that she should remain, promised her if she would remain and continue to serve him during his life, and would forbear to press for her wages, he would, in view of the past and the future, leave her a life interest in the Manor House farm, which he expected to receive from his uncle, and in any other property of which he might be possessed, and would eventually secure such life interest to her; and it was mutually agreed between them to that effect. On the faith of that promise, she continued to serve him until his death, in 1877. By his will, he left the property in question to her, according to his agreement, for her life; but, through

inadvertence, the will, though signed by Mr. Alderson, was not properly attested, and therefore failed. Here, as there, was an alleged promise, made upon consideration, to devise by will a certain interest in land. Here, as there, is alleged full performance by the promisee of the condition. There was solemn recognition by the promisor of the obligation; not so here, for the deliberate writings of the parties speak to the contrary. The court held that there could be no recovery. The discussion of the case by Lord Justices Bramwell, Baggallay, and Brett, in the court of appeals, and by Lord Chancellor Selborne, Lord O'Hagan, Lord Blackburn, and Lord Fitzgerald, in the house of lords, was able and exhaustive, and leaves no room for suggestion. The argument is, as I think, conclusive against the right of the appellant here.

We find the appellant in possession of certain lands under written lease. He alleges a parol undertaking for the conveyance of those lands, and claims that his possession was under that agreement. The presumption is that possession is referable to the written agreement, and not to the parol undertaking.

Thus, Baggallay, L. J., in Alderson v. Maddison, supra, speaking of possession as an act of part performance, observes:

"The admission into possession of a stranger is, speaking in general terms, a sufficient part performance, for it is not explicable upon any other supposition than that it has resulted from a contract in respect of the lands of which possession has been given. Again, the continuance in possession of a tenant is not in itself a sufficient part performance of a parol agreement for the purchase from the landlord, for it is equally consistent with a right depending upon his tenancy."

It is well settled that, in the absence of fraud, accident, or mistake, parol evidence should not be allowed to contradict the terms of a written agreement; that the writing speaks, and conclusively, the conclusion to which the parties have arrived; and that all prior negotiations are merged in it. To sustain these appeals, the majority opinion invokes the rule that when an agreement is made, and is but partially reduced to writing, it is competent to show the agreement which rests in parol. There cannot be dispute of this general rule, and the court rests its judgment squarely and frankly upon it. But, strangely enough, the court has overlooked the recognized qualification and limitation of the rule,—that the oral agreement must be consistent with and must not contradict the stipulations of the written contract.

In Union Stock-Yards & Transit Co. v. Western Land & Cattle Co., 18 U. S. App. 438, 453, 7 C. C. A. 660, and 59 Fed. 49, this court recognized and asserted the rule and its qualification. We there said:

"Parol evidence may be received of the existence of an independent oral agreement, not inconsistent with the stipulations of the written contract, in respect to a matter to which the writing does not speak, but not to contradict the contract."

The principle was reasserted by this court in Gorrell v. Insurance Co., 24 U. S. App. ——, 11 C. C. A. 240, 246, and 63 Fed. 371, 377. It is there said that the admission of the parol evidence there offered would have been in plain violation of the familiar rule "which precludes the admission of parol evidence to contradict or substan-

tially vary the legal import of a written agreement." The court further observed that "the rule that, where an oral agreement has been but partially reduced to writing, the whole agreement is open to proof, is not applicable. The proof proposed here was of an agreement inconsistent with the writing, which in itself is complete and unambiguous." The principle is well established, and has been uniformly asserted by the supreme court, that, in the absence of fraud, accident, or mistake, parol evidence of an oral agreement alleged to have been made at the time of the written contract cannot be permitted, either at law or equity, to vary, qualify, or contradict, or add to, or subtract from, the absolute terms of the written contract. Specht v. Howard, 16 Wall. 564; Forsyth v. Kimball, 91 U. S. 291; Brown v. Spofford, 95 U. S. 474; Insurance Co. v. Mowry, 96 U. S. 549; Thompson v. Insurance Co., 104 U. S. 252; Bast v. Bank, 101 U. S. 93, 96; Martin v. Cole, 104 U. S. 30, 38; Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213; Burnes v. Scott, 117 U. S. 582, 585, 6 Sup. Ct. 865; Falk v. Moebs, 127 U. S. 607, 8 Sup. Ct. 1319; De Witt v. Berry, 134 U. S. 316, 10 Sup. Ct. 536; Seitz v. Machine Co., 141 U. S. 518, 12 Sup. Ct. 46.

In Thompson v. Insurance Co. there was set up a parol agreement, made on receiving the written agreement, that the policy of insurance should not become void on the nonpayment of the note alone at maturity, but was to become void at the instance and election of the defendant, which election had never been made. Mr. Justice Bradley, delivering the opinion of the court, observes:

"As this supposed agreement is in direct contradiction to the express terms of the policy and the note itself, it cannot affect them, but is itself void. * * * But a parol agreement made at the time of issuing the policy, contradicting the terms of the policy itself, like any other parol agreement inconsistent with a written instrument made contemporary therewith, is void, and cannot be set up to contradict the writing. So, in this case, a parol agreement supposed to be made at the time of giving and accepting the premium note cannot be set up to contradict the express terms of the note itself and of the policy under which it was taken."

The courts of the states, with the possible exception of Pennsylvania, have uniformly asserted the rule. The supreme court of Wisconsin in Hei v. Heller, 53 Wis. 415, 10 N. W. 620, has gone so far as to hold that, to permit evidence of a parol undertaking contemporaneous with a written contract, it must appear from the writings themselves that the whole agreement was not reduced to writing. I remark this without expression of any opinion upon the correctness of that ruling.

The reason of the general rule is obvious, and is thus quaintly stated by Lord Coke, in Countess of Rutland's Case, 5 Coke, 26a:

"It would be inconvenient that matters in writing, made by advice and on consideration, and which finally impart the certain truth of the agreement of the parties, should be controlled by the averment of the parties, to be proved by the uncertain testimony of slippery memory; and it would be dangerous to purchasers and all others in such cases if such nude averments against matter in writing should be admitted."

The court invokes as applicable here the rule that a court of equity will receive oral evidence to show that an instrument of conveyance, absolute on its face, was in reality intended as a mortgage

security only. This principle is an exception to the general rule, and is tolerated upon the ground that one who requires an absolute deed when the transaction is in reality a loan is guilty of a fraud against which equity will relieve. It may be said that in such case the law permits oral evidence of a defeasance in contradiction of the deed. That does not seem to be the ground upon which the cases bottom the rule. Even if it may be said to be a contradiction of a written instrument by oral testimony, it is confessedly an exception, grafted upon the general principle, and in prevention of fraud. The court here, as I think, has swept away the general principle, and made the exception the rule, and the rule the exception. I see no escape from the conclusion that the decision here, carried to its logical consequence, throws wide open the door for the admission of oral testimony in contradiction of the written agreement of parties; and herein lies a fundamental and serious error into which, as I think, the court has fallen.

The court is of opinion that the appellant's case with respect to the $15,000 note stands upon a different footing than the alleged parol undertaking for the conveyance of the land. The court finds that Jacob Harman intended to give his nephews the principal at his death. Indeed, having held the parol undertaking to have been made as charged, it should also have been found that Jacob Harman agreed with his nephews, in consideration of their paying him 10 per cent. interest upon the amount during his life, that the principal should go to them at his death. The agreement stands upon the same footing with the parol undertaking for the conveyance of the land, has as strong a consideration to support it, and is equally as binding. In the one case, the nephews have the money, paying a large rate of interest; in the other, they have the use of the land, paying but one-half its rental value. Their right to the principal at the death of the uncle rested in contract, as does their right to the land. In the one case the court gives them the land, and in the other denies them the principal they had contracted for. The court says with respect to the enforced payment of the principal of the note: "They have not much to complain of in equity and good conscience." I agree with the court. But they have as little to complain of in one case as in the other, and, if they have a right to complain in the one case, they have in the other. If their rights rest in contract, they have right to relief as to both land and money. If their claims rested simply in the intention of their uncle, they have right to neither. The court finds in the one case it was contract, and in the other case that it was intention; finding, however, that there was consideration with respect to both. I cannot comprehend the logic by which the court reaches a conclusion which seems to me paradoxical.

A word with respect to the general equity of the case. In suits of this character, courts are asked to exercise an extraordinary jurisdiction. They should look to the substantial justice of the case. They should be satisfied that a fraud would be perpetrated upon the party seeking to enforce an alleged parol agreement if his prayer be not granted. The appellant, for 10 years prior to the

uncle's death, occupied 1,640 acres of this land, at a rental of 90 cents an acre. He says that during that time he expended $9,000 in improvements upon the place, mainly in the way of drains and fences. The written evidence would indicate that Jacob Harman paid, at least to some considerable extent, for these improvements. But, conceding the fact to be as stated, they were such improvements, according to the appellant's evidence, as were necessary and customary to permit the land to be worked to advantage, and were made from money derived from the cultivation of the land. It may be fairly inferred from the evidence that during all these years Jacob Harman paid the taxes upon these lands. So that the appellant, during his 10 years' occupancy of the 1,640 acres of land, saved $1,804 per annum in rental, the difference between the rental paid and the fair rental of the land, amounting in all to $18,040. He expended $9,000 in improvements, which, deducted from the sum above mentioned, leaves a clear profit and saving to him of $9,040 from his possession of this land. It is well settled that where the improvements made are such as are required by ordinary husbandry, and do not exceed in value the rents and profits enjoyed, a case is not made out for the interposition of a court of equity, although the parol undertaking may be clearly established. Bailey v. Edmunds, 64 Ill. 125, 128; Padfield v. Padfield, 92 Ill. 198; Wallace v. Rappleye, 103 Ill. 229, 252; Cassel v. Cassel, 104 Ill. 361.

By the will of their uncle Jacob Harman, the five sons of his brother Anthony, including the appellant, out of an estate of 4,200 acres of land, are given for life some 2,900 acres of land, with remainder to their children, being over two-thirds of the entire estate. The appellant receives 600 acres of land, his improvements being upon such land. I fail to grasp the persuasive equity which induces the court to say that, if a rule of evidence should prevent relief here, "a court of equity might almost as well shut up its doors, and turn the parties over to their rights at law." I cannot agree that a rule of evidence which prohibits oral testimony in contradiction of the written agreement of parties—a rule absolutely essential to the protection of rights of property—should be summarily swept away to meet the supposed equities of the case in hand. If the rule established by the court in this case should be followed, it logically results, as I think, that all written obligations, all titles to land, are held at the mercy of parol testimony and of the uncertain memories of men. If parol evidence of an interested party is to avail to establish a contract with a deceased person in contradiction of written agreements, and such parol undertaking is held to be established by statements of the declarations of the deceased touching his intentions, all persons having property and inclination to aid those bound to them by ties of blood need to be careful in their expressions of friendship and of their intentions with respect to the bestowal of bounty upon their death.

I am conscious that I have unduly extended this opinion; but, impressed with the serious consequences that must result if the judgment of the court shall be followed in like actions, I deem it my duty to place on record this expression of dissent.